# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP1737-CR & 2013AP218-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |       Plaintiff-Respondent, |
| |    v. |
| | Michael R. Luedtke, |
| |       Defendant-Appellant-Petitioner. |
| | ------------------------------------------------ |
| | State of Wisconsin, |
| |       Plaintiff-Respondent, |
| |    v. |
| | Jessica M. Weissinger, |
| |       Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 355 Wis. 2d 436, 851 N.W.2d 837)
(Ct. App. 2014 – Published)
PDC No: 2014 WI App 79
------------------------------------------------
REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 355 Wis. 2d 546, 851 N.W.2d 780)
(Ct. App. 2014 – Published)
PDC No: 2014 WI App 73

| | |
|---|---|
| OPINION FILED: | April 24, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 3, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit/Circuit |
|   COUNTY: | Winnebago/Ozaukee |
|   JUDGE: | Karen L. Seifert /Sandy A. Williams |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion Filed.) |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

    For the defendant-appellant-petitioner Michael R. Luedtke, the cause was argued by *Gerald P. Boyle*. There were briefs by *Donald T. Lang*, assistant state public defender.

For the defendant-appellant-petitioner Jessica M. Weissinger, the cause was argued by *Gerald P. Boyle*. There were briefs by *Gerald P. Boyle*, and *Boyle, Boyle & Boyle, S.C.*, Milwaukee.

For the plaintiff-respondent in both cases, the cause was argued by *Winn S. Collins*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

2

**2015 WI 42**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP1737-CR & 2013AP218-CR
(L.C. No. 2009CF871 & 2010CF116)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

        Plaintiff-Respondent,

    v.

Michael R. Luedtke,

        Defendant-Appellant-Petitioner.

**FILED**

**APR 24, 2015**

Diane M. Fremgen
Clerk of Supreme Court

State of Wisconsin,

        Plaintiff-Respondent,

    v.

Jessica M. Weissinger,

        Defendant-Appellant-Petitioner.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 MICHAEL J. GABLEMAN, J. This is a review of two published decisions of the court of appeals, State v. Luedtke,

2014 WI App 79, 355 Wis. 2d 436, 851 N.W.2d 837, and State v. Weissinger, 2014 WI App 73, 355 Wis. 2d 546, 851 N.W.2d 780. We consolidated the cases for the purpose of this opinion because both present the same issue on largely similar facts. Both cases require us to examine the constitutional implications of blood sample destruction that deprived the defendants of the opportunity to independently test their samples.

¶2 In Luedtke, the Winnebago County District Attorney's Office charged Michael R. Luedtke ("Luedtke") with one count of operating a motor vehicle while under the influence of a controlled substance (diazepam and methadone), seventh, eighth, or ninth offense, contrary to Wis. Stat. § 346.63(1)(a) (2009-10),[1] and one count of operating a motor vehicle with a

---

[1] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

Wisconsin Stat. § 346.63(1)(a) states:

No person may drive or operate a motor vehicle while: Under the influence of an intoxicant, a controlled substance, a controlled substance analog or any combination of an intoxicant, a controlled substance and a controlled substance analog, under the influence of any other drug to a degree which renders him or her incapable of safely driving, or under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving.

Diazepam is listed as a Schedule IV controlled substance under Wis. Stat. § 961.20(2)(cr). Methadone is listed as a Schedule II controlled substance under Wis. Stat. § 961.16(3)(r).

detectable amount of a restricted controlled substance (cocaine and its metabolite, benzoylecgonine[2]) in the blood, seventh, eighth, or ninth offense, contrary to Wis. Stat. § 346.63(1)(am).[3]  The jury found Luedtke not guilty of operating a motor vehicle while under the influence of a controlled substance but found him guilty of operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood.  The Winnebago County circuit court[4] withheld a sentence and placed Luedtke on probation for a period of four years, with 12 months of conditional jail time, imposed and stayed.

¶3  Luedtke filed a post-conviction motion arguing that the State violated his due process rights when the Wisconsin State Laboratory of Hygiene ("Laboratory") destroyed his blood sample, in accordance with routine procedures, before he had the opportunity to test it.  Luedtke also argued that the charge of

---

[2] See  Benzoylecgonine,  http://www.merriam-webster.com/dictionary/benzoylecgonine (last visited Feb. 9, 2015).

[3] Wisconsin Stat. § 346.63(1)(am) states: "No person may drive or operate a motor vehicle while: The person has a detectable amount of a restricted controlled substance in his or her blood."

Wisconsin Stat. § 967.055(1m)(b) defines restricted controlled substance as any of the following: "1. A controlled substance included in schedule I under ch. 961 other than a tetrahydrocannabinol.  2. A controlled substance analog, as defined in s. 961.01 (4m), of a controlled substance described in subd. 1.  3. Cocaine or any of its metabolites.  4. Methamphetamine.  5. Delta-9-tetrahydrocannabinol."

[4] The Honorable Karen L. Seifert, presiding.

operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood is unconstitutional without scienter.[5] The Winnebago County circuit court rejected both claims, and Luedtke appealed.

¶4 The court of appeals affirmed and concluded (1) that the State did not violate Luedtke's due process rights when the Laboratory destroyed his blood sample in accordance with routine procedures; and (2) that the statute prohibiting operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood is a strict liability offense, and thus does not require scienter. Luedtke, 355 Wis. 2d 436, ¶1. Further, the court concluded that the statute was constitutional. Id.

¶5 In Weissinger, the Ozaukee County District Attorney's Office charged Jessica M. Weissinger ("Weissinger") with one count of injury by use of a vehicle with a restricted controlled substance in the blood causing great bodily harm, contrary to Wis. Stat. § 940.25(1)(am),[6] and one count of operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood (Delta-9-tetrahydrocannabinol ("THC")),

---

[5] Scienter is defined as "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission." Black's Law Dictionary 1463 (9th ed. 2009).

[6] Wisconsin Stat. § 940.25(1)(am) states: "Any person who does any of the following is guilty of a Class F felony: Causes great bodily harm to another human being by the operation of a vehicle while the person has a detectable amount of a restricted controlled substance in his or her blood."

4

second offense, contrary to Wis. Stat. § 346.63(1)(am). Prior to trial, Weissinger filed a motion to dismiss, arguing that the admission of her blood test results into evidence violated her due process rights because the Laboratory had destroyed her blood sample before she had the opportunity to test it. The Ozaukee County circuit court[7] denied the motion, and the jury subsequently found her guilty of both counts. The court withheld a sentence on both counts and placed Weissinger on probation for a period of five years for count one and two years for count two, to be served concurrently. As a condition of probation, the court ordered five months of conditional jail time, stayed pending Weissinger's appeal. The court of appeals affirmed, concluding that the State did not violate Weissinger's due process rights when the Laboratory destroyed her blood sample in accordance with its routine procedures. Weissinger, 355 Wis. 2d 546, ¶1.

¶6 Two issues are presented for our review. The first, applicable to both parties, is whether the State violated Luedtke and Weissinger's due process rights when the Laboratory destroyed their blood samples, pursuant to routine procedures, before each had the opportunity to test the samples. The second, applicable to only Luedtke, is whether operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood under Wis. Stat. § 346.63(1)(am) is a

---

[7] The Honorable Sandy W. Williams, presiding.

5

strict liability offense, and, if so, whether the statute is constitutional.

¶7 First, based on precedent, we hold that, in the context of evidence preservation and destruction, the Wisconsin Constitution does not provide greater due process protection under Article 1, Section 8, Clause 1[8] than the United States Constitution under either the Fifth[9] or Fourteenth[10] Amendments. As a result, Arizona v. Youngblood, 488 U.S. 51 (1988), controls. Accordingly, in order to prevail, Luedtke and Weissinger must show that the State (1) failed to preserve evidence that was apparently exculpatory, or (2) acted in bad faith by failing to preserve evidence that was potentially exculpatory. State v. Greenwold, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994) (Greenwold II). Luedtke and Weissinger's blood samples were neither apparently exculpatory nor destroyed in bad faith; therefore, the State did not violate their due process rights.

---

[8] Wisconsin Const. art 1, § 8, cl. 1 states: "No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself."

[9] United States Const. amend. V states: "No person shall be . . . deprived of life, liberty, or property, without due process of law."

[10] United States Const. amend. XIV, § 1 states: "No state shall . . . deprive any person of life, liberty, or property, without due process of law."

¶8 Second, we hold that operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood under Wis. Stat. § 346.63(1)(am) is a strict liability offense that does not require scienter, and is constitutional. We therefore affirm the court of appeals.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A. Michael R. Luedtke

¶9 On April 27, 2009, at 2:07 PM in Oshkosh, Wisconsin, Luedtke, driving a Ford Escort belonging to his employer, rear-ended another vehicle, extensively damaging it and injuring its driver. Luedtke stated that he caused the accident when he took his eyes off the road to reach for his cell phone. Police officers arrived at the scene and eyewitnesses told them that Luedtke had stuffed a blue bag-like item into the sewer after the collision. Detective Christopher Guiliani ("Detective Guiliani") searched the sewer and found a blue shirt wrapped around six syringes and a metal spoon. Luedtke later testified that he hid the syringes, but not the spoon, in the sewer in a panic because he thought that they were illegal items. He also testified that he did not know that the items were in the car before the accident.

¶10 At the scene, Officer Joseph Framke ("Officer Framke") spoke with Luedtke. Luedtke admitted that he had taken several prescription medications and occasionally used marijuana. Luedtke consented to a search of his vehicle and Officer Framke found, in the driver's side door pocket, three additional syringes and an unlabeled prescription bottle containing powder

7

residue. In his initial interactions with Luedtke, Officer Framke did not notice any significant signs of intoxication but concluded that Luedtke was impaired after Luedtke failed standard field sobriety tests. Detective Brett Robertson ("Detective Robertson") administered a 12-step test that helps to determine if a person is under the influence of drugs and concluded that Luedtke was impaired. Luedtke claimed that his poor performance on the sobriety tests was due to prior injuries, his misunderstanding of the directions, and injuries that he sustained during the accident. Detective Robertson also observed fresh puncture marks near Luedtke's right thumb. Luedtke admitted that while he did inject morphine, the particular puncture marks observed by Detective Robertson were from work injuries, not drugs.

¶11 It is undisputed that at 3:28 PM on the day of the accident police conducted a legal blood draw. Prior to the blood draw, Detective Guiliani read Luedtke the "informing the accused"[11] form after which Luedtke consented to the blood draw. The informing the accused form told Luedtke that:

---

[11] Wisconsin Stat. § 343.305(4) requires that a law enforcement officer provide certain information to a person after being arrested for operating while under the influence of alcohol or drugs. The officer must inform the arrestee that his or her blood, breath, or urine sample will be tested for drugs or alcohol. The officer must also inform the arrestee that he or she has the right to take an alternative test free of charge and to have a test conducted by a qualified person of the arrestee's choice and at the arrestee's expense.

> This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. . . . If you take all the requested tests, you may choose to take further tests.  You may take the alternative test that this law enforcement agency provides free of charge.  You may also have a test conducted by a qualified person of your choice at your expense.

Luedtke declined an alternative test.

¶12  On April 30, 2009, Luedtke's blood sample arrived at the Laboratory, a public health laboratory at the University of Wisconsin that is accredited by the American Board of Forensic Toxicologists and that acts independently from the direction of any law enforcement agency.  On May 1, 2009, Advanced Chemist Thomas Neuser ("Neuser") tested Luedtke's blood sample for alcohol.  The Laboratory generated a report in May 2009 indicating that Luedtke's blood tested negative for alcohol. The report stated that "Specimen(s) will be retained no longer than six months unless otherwise requested by agency or subject."

¶13  On November 18, 2009, the sample underwent a more comprehensive Gas Chromatograph with Mass Selective Detector ("GCMSD") drug panel screen.  This test indicated the presence of the anti-depressant venlafaxine, the narcotic methadone, and the anti-anxiety medication diazepam, all within the therapeutic range.  The test results also indicated the presence of cocaine, at less than 20 nanograms[12] per milliliter, and the cocaine

---

[12] A nanogram is one billionth of a gram.

9

metabolite benzoylecgonine, at 330 nanograms per milliliter. The detection limit for cocaine is ten nanograms, below which it is reported as not detected. In November 2009, the Laboratory generated a second report that identified these drugs as present in Luedtke's blood.

¶14 The Laboratory mailed copies of both the May 2009 report and November 2009 reports to Luedtke, but he claims that he never received them.

¶15 On December 18, 2009, the Winnebago County District Attorney's Office charged Luedtke with one count of operating a motor vehicle while under the influence of a controlled substance (diazepam and methadone), seventh, eighth, or ninth offense, contrary to Wis. Stat. § 346.63(1)(a), and one count of operating a motor vehicle with a detectable amount of a restricted controlled substance (cocaine and its metabolite, benzoylecgonine) in the blood, seventh, eighth, or ninth offense, contrary to Wis. Stat. § 346.63(1)(am).

¶16 Luedtke failed to appear at his initial appearance scheduled for January 11, 2010, because he was in custody in Outagamie County. On February 4, 2010, the Laboratory destroyed Luedtke's blood sample. Luedtke claims that he first saw the blood test results at his initial appearance on May 24, 2010.

¶17 On December 28, 2010, Luedtke filed a motion to dismiss or to suppress the blood test results on the ground that the Laboratory had destroyed his blood. The circuit court denied Luedtke's motion, finding no evidence of bad faith on the part of the Laboratory. The court suggested that Luedtke inform

10

the jury that he was not given a chance to retest the sample due to its destruction.

¶18 On April 17, 2012, the State tried Luedtke before a jury. Luedtke's counsel cross-examined Neuser, who testified that blood testing is not infallible and that the reported value does not always match the target value with an unstable molecule like cocaine, though this discrepancy does not constitute a false positive. Luedtke also cross-examined Officer Framke, who admitted that Luedtke did not display signs of impairment during their initial interactions. Luedtke testified and explained his use of venlafaxine, methadone, and diazepam, and denied any cocaine use. Luedtke also testified that he could not retest his blood sample because the Laboratory destroyed it before he was aware of the results. Further, Luedtke admitted that he hid the syringes, but not the spoon, in the sewer. During his closing argument, Luedtke focused on the Laboratory's destruction of the blood sample. Luedtke did not call an expert witness, object to any jury instructions, or request any additional information be added to the record.

¶19 The jury found Luedtke not guilty of count one, operating under the influence of a controlled substance. The jury found Luedtke guilty of count two, operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood. On April 17, 2012, the court entered a judgment of conviction, withheld sentence, and placed Luedtke on probation for a period of four years, with 12 months of conditional jail time, imposed and stayed.

11

¶20 On May 31, 2013, Luedtke filed a post-conviction motion that challenged the admission into evidence of the blood test result and the constitutionality of Wis. Stat. § 346.63(1)(am). He asserted that, even if the court admitted the blood test results into evidence, the jury should have been instructed that they could infer that the sample could have been exculpatory had it not been destroyed. Luedtke also contended that he was denied the effective assistance of counsel. The circuit court denied the motions, concluding that the State did not violate Luedtke's due process rights when the Laboratory destroyed his blood sample. The court also concluded that § 346.63(1)(am) is a constitutional strict liability offense.

¶21 On June 11, 2014, the court of appeals affirmed the circuit court's judgment of conviction and order denying postconviction relief. The court of appeals concluded that § 346.63(1)(am) is a strict liability offense and is constitutional. Luedtke, 355 Wis. 2d 436, ¶¶15-19. The court also concluded that Luedtke failed to show that his blood sample was apparently exculpatory or that it was destroyed in bad faith. Id., ¶¶22, 24. Finally, the court concluded that, despite the blood sample's destruction, Luedtke received a fair trial. Id., ¶25-26.

¶22 Luedtke successfully petitioned this court for review.

### B. Jessica M. Weissinger

¶23 On July 6, 2009, in Mequon, Wisconsin, between 5:00 and 5:30 PM, Weissinger's vehicle collided with a motorcycle. The motorcyclist saw Weissinger's vehicle swerve into his lane

12

when Weissinger turned left at an intersection. Despite applying his brakes, the motorcyclist struck Weissinger's vehicle and was thrown to the pavement causing a broken back, shattered wrists, a head laceration, and a concussion. Weather was not a factor in the crash.

¶24 Law enforcement and emergency medical personnel arrived at the scene and administered treatment to the motorcyclist. Investigating Officer Mark Riley ("Officer Riley") spoke with Weissinger for about one minute. Officer Riley noted that Weissinger had bloodshot eyes, but acknowledged that this was consistent with her emotional state and not necessarily indicative of impairment. Officer Brent Smith ("Officer Smith") also examined Weissinger and did not believe her to be intoxicated.

¶25 Officer Riley did not initially believe that Weissinger was under the influence of drugs or alcohol. However, anticipating a fatality investigation, he obtained Weissinger's consent for a blood draw. Officer Riley transported Weissinger to the hospital in a Mequon Police Department vehicle. It is undisputed, however, that she was not under arrest at the time. Because the police did not arrest Weissinger for an impaired driving offense, Officer Smith was not required to provide her with an "informing the accused"[13]

---

[13] This incident occurred before the 2010 amendment to Wis. Stat. § 343.305(4), in which the legislature amended the statute to require that the "informing the accused" information be provided after any vehicular collision involving grave injury, great bodily harm, or death.

13

warning before her blood draw. Officer Smith testified that he did not inform Weissinger that she could take an alternate test but also testified that he would have complied with such a request had she made one.

¶26 At 6:45 PM that same evening, technician Lisa Brandt drew Weissinger's blood, with all parties confirming that both the draw and the return of the sample to the police were acceptable. On July 10, 2009, Weissinger's blood sample arrived at the Laboratory. On July 13, 2009, the Laboratory tested the blood sample for alcohol. The following day, the Laboratory generated a report that stated that the test results did not show the presence of alcohol. The report also stated that: "Specimen(s) will be retained no longer than six months unless otherwise requested by agency or subject."

¶27 On August 7, 2009, the Laboratory tested Weissinger's blood sample for drugs using the GCMSD drug panel screen. The GCMSD found that Weissinger's blood contained near-therapeutic range levels of the anti-depressant fluoxetine and therapeutic range levels of the narcotic oxycodone. On February 24, 2010, the final GCMSD analysis revealed that her blood contained THC at a level of 5.9 nanograms per milliliter. On March 7, 2010, the Laboratory generated a report identifying the presence of THC.

¶28 The Laboratory mailed the July 2009 report and March 2010 report to Weissinger, though she claims that she never received them. In late April 2010, the Laboratory discarded her blood sample in accordance with its routine practice.

14

¶29 On May 24, 2010, the Ozaukee County District Attorney's Office charged Weissinger with one count of injury by use of a vehicle with a restricted controlled substance (THC) in the blood causing great bodily harm, contrary to Wis. Stat. § 940.25(1)(am), and one count of operating a motor vehicle with a detectable amount of a restricted controlled substance (THC) in the blood, second offense, contrary to Wis. Stat. § 346.63(1)(am).

¶30 On May 3, 2011, Weissinger made her first request to retest the blood sample. Soon after, she filed a formal motion to retest the sample. In May 2011, the Laboratory informed her that it had destroyed her blood sample in late April 2010. Weissinger filed a motion to dismiss the charges on the ground that her blood sample had been destroyed. The circuit court denied Weissinger's motion, concluding that the State did not violate Weissinger's due process rights.

¶31 From April 23-24, 2012, the case was tried before a jury. The circuit court gave Weissinger wide latitude during cross-examination. Weissinger cross-examined Advanced Chemist Amy Miles ("Miles"), the analyst who tested Weissinger's blood sample for drugs. During cross-examination, Miles acknowledged that testing is not infallible and that she had no certain evidence or direct knowledge of whether Weissinger received the Laboratory's reports. Miles also testified that, based on the blood test results, Weissinger was likely a regular user of marijuana and probably had consumed the substance within a few hours before the accident, certainly within 24 hours. The

court, prior to trial, also gave Weissinger additional time to hire an expert witness for her defense, though she ultimately declined to do so.

¶32 The circuit court also allowed the jury to hear a statement from Weissinger explaining she was unable to retest her blood sample because it no longer existed. The court prohibited the State from indicating that Weissinger waited until May 2011 to request a retest of the blood.

¶33 The jury found Weissinger guilty of both counts. The circuit court withheld sentence and placed her on probation for a period of five years for count one and a period of two years for count two, to be served concurrently. As a condition of probation, the court ordered five months of conditional jail time, stayed pending Weissinger's appeal.

¶34 On June 25, 2014, the court of appeals affirmed. The court rejected Weissinger's argument that the destruction of her blood sample violated due process. Weissinger, 355 Wis. 2d 546, ¶1. The court reasoned that pursuant to Youngblood, Weissinger failed to show either that the blood sample was apparently exculpatory or that it was destroyed in bad faith. Id., ¶19.

¶35 Judge Reilly dissented. Judge Reilly argued that "[a] criminal justice system that allows the government to destroy the sole evidence of a person's guilt prior to notice, charging, or a meaningful opportunity for the accused to inspect the State's evidence is fundamentally unfair." Id., ¶31 (Reilly, J., dissenting). Judge Reilly argued Youngblood was inapplicable in the present case because Weissinger's blood

16

sample had inculpatory value, not merely "conceivable evidentiary significance." Id., ¶38 (Reilly, J., dissenting).

¶36 Weissinger successfully petitioned this court for review.

## II. STANDARD OF REVIEW

¶37 "Whether state action constitutes a violation of due process presents a question of law, which this court decides independently . . . ." State v. Neumann, 2013 WI 58, ¶32, 348 Wis. 2d 455, 832 N.W.2d 560. We uphold the circuit court's findings of historical fact unless they are clearly erroneous. State v. Felix, 2012 WI 36, ¶22, 339 Wis. 2d 670, 811 N.W.2d 775.

¶38 "Statutory interpretation is a question of law that this court reviews de novo . . . ." Noffke ex rel. Swenson v. Bakke, 2009 WI 10, ¶9, 315 Wis. 2d 350, 760 N.W.2d 156. Whether a statute is unconstitutional also is a question of law that this Court reviews de novo. Neumann, 348 Wis. 2d 455, ¶32 (citing State v. Sorenson, 2002 WI 78, ¶25, 254 Wis. 2d 54, 646 N.W.2d 354). Statutes are presumed to be constitutional. State v. Jadowski, 2004 WI 68, ¶10, 272 Wis. 2d 418, 680 N.W.2d 810. "A party challenging a statute's constitutionality must [] demonstrate that the statute is unconstitutional beyond a reasonable doubt." Id.

## III. DISCUSSION

### A. Youngblood Controls

¶39 Luedtke and Weissinger's primary argument on appeal is that the Wisconsin Constitution provides greater due process

17

protections than the United States Constitution in the context of evidence preservation and destruction. We disagree. Based on our precedent we hold that, in the context of evidence preservation and destruction, the Wisconsin Constitution does not provide greater due process protections under Article 1, Section 8, Clause 1 than the United States Constitution does under either the Fifth or Fourteenth Amendments. As a result, Arizona v. Youngblood, controls. In order to prevail, Luedtke and Weissinger would have to show that the State (1) failed to preserve evidence that was apparently exculpatory or (2) acted in bad faith by failing to preserve evidence that was potentially exculpatory. Greenwold II, 189 Wis. 2d at 67. The blood samples were neither apparently exculpatory nor destroyed in bad faith; therefore, the State did not violate Luedtke and Weissinger's due process rights.

¶40 "This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law." Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. Adhering to precedent

> ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results. Consequently, this court has held that any departure from the doctrine of stare decisis demands special justification.

Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (citations and quotations omitted).

> The rationales for following the doctrine of stare decisis . . . include: '[1] the desirability that the law furnish a clear guide for conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; [2] the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and [3] the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.'

Johnson Controls, 264 Wis. 2d 60, ¶95 (quoting Moragne v. States Marine Lines, Inc., 398 U.S. 375, 403 (1970)). "Stare decisis is the preferred course [of judicial action] because it promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process." State v. Ferron, 219 Wis. 2d 481, 504, 579 N.W.2d 654 (1998) (quoting Payne v. Tennessee, 501 U.S. 808, 827 (1991)).

> Five factors typically contribute to a decision to overturn prior case law. This court is more likely to overturn a prior decision when one or more of the following circumstances is present: (1) Changes or developments in the law have undermined the rationale behind a decision; (2) there is a need to make a decision correspond to newly ascertained facts; (3) there is a showing that the precedent has become detrimental to coherence and consistency in the law; (4) the prior decision is unsound in principle; or (5) the prior decision is unworkable in practice.

Bartholomew v. Wisconsin Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216 (quotations omitted).

¶41 Wisconsin has a well-settled and long standing body of law on the due process implications of evidence preservation and destruction. See, e.g., State v. Disch, 119 Wis. 2d 461, 351

19

N.W.2d 492 (1984); State v. Ehlen, 119 Wis. 2d 451, 351 N.W.2d 503 (1984); State v. Walstad, 119 Wis. 2d 483, 351 N.W.2d 469 (1984). This precedent requires that, to prevail on a due process challenge, a defendant must show that that evidence was either apparently exculpatory or that the State acted in bad faith by destroying evidence that was potentially exculpatory. State v. Pankow, 144 Wis. 2d 23, 42-43, 422 N.W.2d 913 (Ct. App. 1988) (citing California v. Trombetta, 467 U.S. 479 (1984)); State v. Greenwold, 181 Wis. 2d 881, 855, 512 N.W.2d 237 (Ct. App. 1994) (Greenwold I) (citing Youngblood). Our precedent interprets the Wisconsin Constitution as providing the same due process protections for evidence preservation and destruction as the United States Constitution. Greenwold II, 189 Wis. 2d at 71.

¶42 As early as 1984, we held that "[t]he importance of the production of the original breath ampoule or a portion of the blood sample as the sine qua non of due process is a myth that should not be perpetuated." Ehlen, 119 Wis. 2d at 453. We held that it was an error "to conclude due process will be violated if a blood test is not suppressed merely because a portion of the sample—even if it were retestable—could not be produced for further tests." Id. at 457. We were "convinced that the claim that due process could only be preserved for defendants by such retests was illusory." Disch, 119 Wis. 2d at 480.

¶43 That same year, the United States Supreme Court concluded that due process did not require the preservation of a

breath sample in order to introduce breathalyzer results at trial. Trombetta, 67 U.S. at 491. Even though a re-test could lead to exculpatory evidence, the Court nevertheless held there was no due process violation because the destruction occurred in good faith and in accordance with normal evidence retention practice. Id. at 488.

¶44 In Youngblood, the Supreme Court reaffirmed this principle. The Court noted "the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government." Youngblood, 488 U.S. at 57. The Court was unwilling to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable significance in a particular prosecution." Id. at 58.

¶45 Post-Youngblood, Wisconsin courts have adhered to this precedent. In Greenwold II, the court of appeals concluded that "the due process clause of the Wisconsin Constitution is the substantial equivalent of its respective clause in the federal constitution." Greenwold II, 189 Wis. 2d at 71 (citing State v. McManus, 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989)). Greenwold II continued to hold to precedent in concluding that the Youngblood test controlled and, because the Wisconsin Constitution did not provide any greater protection, that due process did not require the preservation of a breath or blood sample. Id.

21

¶46  Therefore, under longstanding Wisconsin precedent, it is clear that the routine destruction of a driver's blood or breath sample, without more, does not deprive a defendant of due process.  To prevail on a due process challenge, the defendant must show that the evidence was apparently exculpatory or that it was destroyed in bad faith.  Greenwold II, 189 Wis. 2d at 67.  Bad faith can be shown only if "(1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; and (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence."  Id. at 69.  The United States Supreme Court, this court, and the court of appeals have all expressly rejected the argument that due process requires the preservation of blood samples.

¶47  Though our precedent is clear that destruction alone does not create a due process violation under either constitution, Luedtke and Weissinger both argue that changes or developments in the law, specifically State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, have undermined the rationale behind our precedent.[14]

¶48  In Dubose, we held that Article I, Section 8 of the Wisconsin Constitution contained a broader due process right

---

[14] We restricted briefing to the first Bartholomew factor: "Whether changes or developments in the law in State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, have undermined the rationale behind [the] Ehlen, Disch, Walstad, Pankow, and Greenwold II decisions."

than that contained within the Fifth and Fourteenth Amendments to the United States Constitution. Dubose, 285 Wis. 2d 143, ¶41. However, we restricted this broader right to the specific context of an identification procedure known as a "showup." Id., ¶45. "A showup is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." Id., ¶1 n.1 (quotations and citation omitted). We explained that the identification of a defendant by "a showup will not be admissible unless, based on the totality of the circumstances, the showup was necessary" because a "lineup or photo array is generally fairer than a showup . . . thus reducing the risk of a misidentification." Id., ¶¶33, 45. We held that the Wisconsin Constitution provided greater protection in this context because new studies had demonstrated that unreliable eyewitness identification contributed to wrongful convictions, thereby providing a compelling justification for overruling precedent. Id., ¶¶29-30, 33. Three justices dissented, and would have held that the state and federal constitutions provided identical protections. Id., ¶56 (Wilcox, J., dissenting), ¶68 (Prosser, J., dissenting), ¶89 (Roggensack, J., dissenting).

¶49 However, post-Dubose, we have held that the decision did not create a precedential sea change with respect to the recognition of a broader due process protection under the Wisconsin Constitution than under the United States Constitution. In State v. Drew, 2007 WI App 213, ¶¶2, 17, 305 Wis. 2d 641, 740 N.W.2d 404, the court of appeals held that

23

DuBose did not alter precedent with respect to lineups and photo arrays, explaining that Dubose recognized those identification procedures are preferable to a showup. In State v. Hibl, 2006 WI 52, ¶56, 290 Wis. 2d 595, 714 N.W.2d 194, we held that Dubose did not directly control spontaneous or accidental identifications of a defendant by a victim lacking police involvement. Finally, in State v. Ziegler, 2012 WI 73, ¶¶81-82, 342 Wis. 2d 256, 816 N.W.2d 238, we distinguished a showup from an identification made in court through the showing of a single mug shot.

¶50 The State correctly notes, even within the specific context of eyewitness identification, post-Dubose jurisprudence confirms the limited reach of its actual holding: that due process under the Wisconsin Constitution provides greater protection in one identification procedure, the showup. Dubose withdrew no language from Ehlen, Disch, Walstad, or Pankow. Dubose is therefore not a sea change or even a development sufficient to undermine the rationale behind Ehlen, Disch, Walstad, Pankow, and Greenwold II.

¶51 Luedtke questions the precedential value of Ehlen and Disch because they were decided before Dubose. Dubose did not involve evidence destruction. The Wisconsin Constitution provides identical protections to the United States Constitution in this context. Luedtke also argues that Ehlen and Disch are distinguishable because "the Court implicitly assumed the defendants were aware of the specific focus of the testing on alcohol." Luedtke argues that, unlike the defendants in Ehlen

24

and Disch, he had no reason to seek an independent test prior to the Laboratory's destruction of his blood sample. That distinction is not persuasive. When the State conducted the blood draw, the officer informed Luedtke that his blood would be tested for drugs and alcohol and that he could have the blood independently tested. Although Luedtke allegedly had no reason to believe that his blood sample would test positive for restricted controlled substances before the Laboratory destroyed it, he knew that his blood sample would be tested for drugs. Thus, he had reason to seek an independent test before the Laboratory destroyed his blood sample. In Ehlen and Disch, we found it significant that the defendants knew of their right to seek independent tests before the State destroyed their blood samples. Ehlen, 119 Wis. 2d at 457; Disch, 119 Wis. 2d at 470. We did not focus on whether the defendants had a reason to independently test their samples before their destruction.

¶52 Further, Luedtke received notice that the "law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system." See Wis. Stat. § 343.305(4). Luedtke thus knew the nature of the investigation when he declined to pursue an alternate test. Luedtke and Weissinger's argument that discovery granted them a post-charge right to the preservation of the blood sample is in conflict with our longstanding precedent. We have consistently held that it is the test results, not the blood samples, that fall within the discovery statute. Ehlen, 119 Wis. 2d at 452.

25

¶53 Because, under our precedent, the Wisconsin Constitution provides no greater due process protections than the United States Constitution regarding evidence preservation and destruction, we now proceed to the application of the Youngblood test. Again, under Youngblood a defendant's due process rights regarding the destruction of evidence are violated if the State (1) fails to preserve evidence that is apparently exculpatory or (2) acts in bad faith by failing to preserve evidence that is potentially exculpatory. Greenwold II, 189 Wis. 2d at 67.

¶54 Neither Luedtke nor Weissinger argue that their blood samples were apparently exculpatory. The fact that Luedtke's blood tested positive for restricted controlled substances, cocaine and its metabolite benzoylecgonine, demonstrates that his blood was apparently not exculpatory. See, e.g., Illinois v. Fisher, 540 U.S. 544, 548 (2004) ("[P]olice testing indicated that the chemical makeup of the substance inculpated, not exculpated, [the] respondent."). Nor has Weissinger shown how her blood sample was apparently exculpatory at the time the Laboratory destroyed it. Her sample, which tested positive for the restricted controlled substance THC, was inculpatory as well. Id.

¶55 Luedtke and Weissinger's due process claims also fail because the State did not destroy their blood samples in bad faith. Luedtke argues that the State acted in bad faith by destroying his blood sample after he was charged and before he received notice of the charge. Weissinger argues the State

26

acted in bad faith by destroying her sample before she was charged.  However, Luedtke and Weissinger have failed to prove bad faith because they have not shown that the State (1) was "aware of the potentially exculpatory value or usefulness of the evidence [the State] failed to preserve"; and (2) "acted with official animus or made a conscious effort to suppress exculpatory evidence."  See Greenwold II, 189 Wis. 2d at 69.

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

Youngblood, 488 U.S. at 58.

¶56 Requiring bad faith is especially sensible once a blood sample has tested positive for a controlled substance, because at that point the sample is "much more likely to provide inculpatory than exculpatory evidence."  See Trombetta, 467 U.S. at 489.  The Laboratory destroyed both Luedtke and Weissinger's blood samples according to routine procedures.  Intentional destruction, without more, does not establish bad faith.

¶57 Weissinger's reliance on State v. Hahn, 132 Wis. 2d 351, 392 N.W.2d 464 (Ct. App. 1986), is misplaced.  The evidence destroyed by the State in Hahn had apparent exculpatory value.  Id. at 360.  By contrast, Weissinger's blood had, at most, potential exculpatory value because, as explained above, the fact that her blood sample tested positive for THC indicated

27

that her blood sample was inculpatory. See, supra, ¶54. Absent bad faith, destruction of evidence that merely has potential exculpatory value does not violate due process. Greenwold II, 189 Wis. 2d at 67 (citing Youngblood, 488 U.S. at 58).

¶58 Finally, both Luedtke and Weissinger received fair trials. In Ehlen and Disch, we framed the due process issue when evidence is destroyed as one of fairness, 119 Wis. 2d at 456; 119 Wis. 2d at 477, and in Trombetta the Supreme Court defined the fairness guarantee as "a meaningful opportunity to present a complete defense." Trombetta, 467 U.S. at 485. When potentially exculpatory evidence is destroyed, "courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id. at 486. However, "the retention of a breath ampoule or of a blood sample [is] of miniscule importance in the assurance of a fair trial when weighed in the balance against the traditional rights of defendants in criminal or quasi-criminal proceedings." Ehlen, 119 Wis. 2d at 456. "[A] whole panoply of due process safeguards [] protect a defendant's right to a fair trial, whether or not at a particular time a sample of blood is retestable." Disch, 119 Wis. 2d at 470. This panoply includes "[t]he right to cross-examine witnesses and experts for the state, the right to impeach by use of the separate blood or breath analysis results, and the right to attack the credibility of the state's witnesses." Ehlen, 119 Wis. 2d at 452.

¶59 We agree with the State that both Luedtke and Weissinger received fair trials.

28

¶60 Luedtke cross-examined witnesses and the court gave him an opportunity to call his own expert witness, although he chose not to do so. Luedtke also had the opportunity to tell the jury that he was unable to test his blood sample because the Laboratory destroyed it. Luedtke received discovery and additional time from the circuit court to prepare his defense and to seek documents from the Laboratory through an open records request. Although Luedtke was unable to retest the blood sample, he was able to analyze the raw data and methodology that the Laboratory used to test the sample. Further, when Luedtke's blood was drawn the officer informed him, in writing, of his right to independently test the sample or to have a second test performed by the State. Due to these these safeguards we conclude that Luedtke's claim of an unfair trial is unpersuasive.

¶61 Weissinger also received a fair trial. The circuit court gave Weissinger full rein to cross-examine the State's witnesses. Weissinger also received discovery. Although she did not call an expert witness, the circuit court granted her extra time to hire one. The circuit court instructed the jury that Weissinger's motion to retest her blood sample was denied because the Laboratory destroyed her sample before the State filed charges. We have held that defendants unable to independently test their blood samples have received fair trials under similar circumstances. See Disch, 119 Wis. 2d at 471; Ehlen, 119 Wis. 2d at 456-57.

¶62 While it is true that the Laboratory destroyed Weissinger's sample before the State filed charges, it was under no obligation to preserve the sample any longer than its internal six month retention policy required. Further, the Laboratory upheld its duty in mailing Weissinger the test results. The test results informed her that, unless she requested otherwise, the Laboratory would destroy her blood sample six months after its receipt. Further, Weissinger was not under arrest at the time of her blood draw, thus the officer was under no obligation to advise her regarding the opportunity for additional tests. Weissinger argues that Ehlen is distinguishable because she was not told that she had the right to independently test her blood sample before it was destroyed. However, Ehlen is still controlling. Weissinger and Ehlen both requested independent tests after the State destroyed their samples. Ehlen, 119 Wis. 2d at 453-54. In fact, Ehlen, like Weissinger, was charged after the State destroyed his blood sample. Id.

¶63 Consequently, because we hold that the State did not violate Luedtke and Weissinger's due process rights, we conclude that the circuit court was not required to give a jury instruction allowing the jury to infer that the lost evidence was exculpatory. Nor was Luedtke denied the effective assistance of counsel. To demonstrate ineffective assistance of counsel, Luedtke must show that counsel's performance was deficient and that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687 (1984). Because we

30

have rejected Luedtke's arguments, Luedtke's claim of ineffective assistance of counsel must fail. See State v. Maloney, 2005 WI 74, ¶37, 281 Wis. 2d 595, 698 N.W.2d 583 ("Counsel does not render deficient performance for failing to bring a [] motion that would have been denied."). Finally, the interest of justice does not mandate a new trial because the real controversy, whether Luedtke operated a motor vehicle with a detectable amount of a restricted controlled substance in his blood, was fully tried. State v. Bannister, 2007 WI 86, ¶43, 302 Wis. 2d 158, 734 N.W.2d 892.

B. Operating a Motor Vehicle with a Restricted Controlled Substance in the Blood is a Constitutional Strict Liability Offense.

¶64 Next, we consider whether operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood under Wis. Stat. § 346.63(1)(am) is a strict liability offense, and, if so, whether the offense is constitutional. Only Luedtke presents this as an issue for review, though we note that the State charged Weissinger under the same statute. We hold that operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood under Wis. Stat. § 346.63(1)(am) is a strict liability offense and is constitutional.

¶65 "An offense is a strict liability offense if it punishes a defendant's behavior without regard to the mental state of the defendant." State v. Polashek, 2002 WI 74, ¶27, 253 Wis. 2d 527, 646 N.W.2d 330. "To convict a defendant of a

31

strict liability offense, the State is not required to prove that the defendant acted with a culpable state of mind while committing the offense." Id. "[S]cienter constitutes the rule in our criminal jurisprudence and is generally presumed even absent express statutory reference." State v. Weidner, 2000 WI 52, ¶11, 235 Wis. 2d 306, 611 N.W.2d 684. "However, strict liability criminal statutes are not unknown." Luedtke, 355 Wis. 2d 436, ¶8. In determining whether a statute imposes strict liability, we have identified six factors for courts to examine. Jadowski, 272 Wis. 2d 418, ¶¶21-30. These six factors are: 1) the language of the statute; 2) the language of related statutes; 3) the legislative history; 4) law enforcement practicality; 5) protection of the public from harm; and 6) the severity of the punishment. Id. (citations omitted). These six factors are sound, and we see no reason to depart from their application.

¶66 The first factor, the language of the statute, weighs in favor of strict liability, as the legislature omitted any requirement that the person know that he has a restricted controlled substance in his blood. In 2003, the legislature prohibited operating a motor vehicle while a "person has a detectable amount of a restricted controlled substance in his or her blood." 2003 Wisconsin Act 97, sec. 2. Wisconsin Stat. § 346.63(1)(am) contains no reference to mental state, and we have previously explained that when a statute makes no reference to intent, the statute often imposes strict liability. See Polashek, 253 Wis. 2d 527, ¶28 ("Often, when the statute makes

32

no reference to intent, we have held that the statute creates a strict liability offense.")  Because the language of the statute does not contain scienter this factor weighs in favor of strict liability.

¶67 The second factor, the language of related statutes, also weighs in favor of strict liability.  Related statutes prohibit 1) the operation of a motor vehicle with a prohibited alcohol concentration,[15] 2) the operation of a motor vehicle by a driver who has not attained the legal drinking age and who has any alcohol in his or her blood,[16] and 3) the operation of a commercial motor vehicle with any alcohol in the driver's blood.[17]  These statutes do not refer to mental state and thus do not require a showing of state of mind.  Had the legislature intended operating while under the influence crimes to require a knowledge requirement, we would expect to see such a requirement in related statutes, but none exists.  Because the legislature has not drafted a scienter requirement into the related

---

[15] Wisconsin Stat. § 346.63(1)(b) states: "No person may drive or operate a motor vehicle while: The person has a prohibited alcohol concentration."

[16] Wisconsin Stat. § 346.63(2m) states: "If a person has not attained the legal drinking age, as defined in s. 125.02 (8m), the person may not drive or operate a motor vehicle while he or she has an alcohol concentration of more than 0.0 but not more than 0.08."

[17] Wisconsin Stat. § 346.63 (7)(a)1 states: "No person may drive or operate or be on duty time with respect to a commercial motor vehicle under any of the following circumstances: While having an alcohol concentration above 0.0."

statutes, we will not read one into this statute.  Jadowski, 272 Wis. 2d 418, ¶22.[18]

¶68  The third factor, the statute's legislative history, also weighs in favor of strict liability.  In the past, we have explained that "[w]hen the legislature's goal is primarily to regulate, to accomplish a social good, or to obtain a high standard of care, proof of a criminal state of mind is often eliminated to achieve the desired result."  State v. Stoehr, 134 Wis. 2d 66, 79, 396 N.W.2d 177 (1986) (citing State v. Collova, 79 Wis. 2d 473, 485, 255 N.W.2d 581 (1977)).  The legislative history of the statute indicates that the legislature was attempting to regulate, accomplish a social good, and obtain a high standard of care by eliminating the requirement that an individual be under the influence of a drug in order to be criminally liable.  See Don Dyke, Wis. Legislative Council Act Memo: 2003 Wisconsin Act 97, Operating Vehicle or Going Armed

---

[18] Luedtke's reliance on State v. Griffin, 220 Wis. 2d 371, 584 N.W.2d 127 (Ct. App. 1998), is not persuasive.  The court of appeals in Griffin held that "the presence of drugs in Griffin's urine and blood stream, without more, is insufficient evidence on which to base a possession conviction."  Griffin, 220 Wis. 2d at 381.  The court reasoned that "to be found guilty of possession of a controlled substance in Wisconsin, the defendant must have had the substance under his or her control and must have knowingly possessed the substance."  Id. (citations omitted).  Griffin may lend support to Luedtke's argument that a person can unknowingly ingest cocaine.  But that assertion has little relevance to the ultimate questions of whether the statute at issue imposes strict liability and, if so, whether the statute is constitutional.  Put simply, Luedtke was charged with operating with a restricted controlled substance in his blood, not with possession of cocaine.

with a Detectable Amount of a Restricted Controlled Substance (Dec. 16, 2003) [hereinafter Legislative Council Memo]. The Legislative Council Memo states: "there is no requirement that the person [be] 'under the influence' of that restricted controlled substance. Evidence of a detectable amount is sufficient. It is often difficult to prove that a person who has used a restricted controlled substance was 'under the influence' of that substance." Id. In and of itself, this history would support a determination that this factor weighs neither in favor nor against strict liability, as it does not indicate, one way or the other, that the legislature considered whether the statute would impose strict liability. See id. However, the Legislative Council Memo goes on to read:

> Two defenses are available if a detectable amount of a restricted controlled substance is found in the bloodstream: (1) a defense to causing death or injury if the defendant can prove the injury or death would have occurred even if the defendant had been exercising due care and did not have a restricted controlled substance in his or her blood (this is an extension of defenses available under current law); and (2) a defense to having methamphetamine, GHB, or the active ingredient of marijuana in the bloodstream if the defendant can show he or she had a valid prescription for that substance.

Id. at 2. Importantly, "unknowing ingestion" is not listed as a defense.

¶69 Further, the legislative history indicates that the legislature intended to make prosecutions easier, by removing the "under the influence" requirement. Requiring the State to prove knowledge would undoubtedly make prosecutions more

35

difficult.   By removing the "under the influence" requirement and not providing "unknowing ingestion" as a defense, the legislature was attempting to regulate drugged driving, accomplish a social good, and impose a high standard of care on those who drive after using restricted controlled substances.

¶70  The fourth factor, law enforcement practicality, also weighs in favor of strict liability.   Intent can be difficult to prove, and, under Luedtke's argument a defendant could assert that he did not knowingly ingest a restricted controlled substance and thus escape liability.   For example, a defendant could claim that he accidentally inhaled marijuana smoke, or ate a piece of candy laced with cocaine.   The legislative history indicates that the legislature intended to make prosecutions easier.   Id.   Requiring proof of knowledge or intent is contrary to the purpose of practical enforcement.

¶71  The fifth factor, the protection of the public from harm, further weighs in favor of strict liability.   The legislature enacted the statute because drivers who have restricted controlled substances in their blood are a threat to

public safety.[19] See State v. Smet, 2005 WI App 263, ¶16, 288 Wis. 2d 525, 709 N.W.2d 474. The legislature created a strict standard to facilitate the prosecution of drugged driving and to protect those who travel on the roads. See Jadowski, 272 Wis. 2d 418, ¶24 (holding that legislative purpose of protecting children weighs in favor of strict liability).

¶72 The sixth factor, the potential penalties imposed, is neutral. This factor is a "significant consideration in determining whether a statute should be construed as dispensing with mens rea." Id., ¶27. "Criminal liability without criminal intent almost always has involved statutes that impose fines or short jail sentences." Id. A first-offense violation of § 346.63(1)(am) is a civil forfeiture. Wis. Stat. § 346.65(2)(am)1. A second offense can result in up to six months in jail, and a third offense can result in up to one year in jail. Wis. Stat. § 346.65(2)(am)2-3. A fourth offense can result in one year in jail, if the individual has a total of four convictions in their lifetime, or a Class H felony with six or more months of imprisonment, if the individual has a total of

---

[19] The Institute for Behavior and Health estimates that 20 percent of motor vehicle crashes are caused by drugged driving, which "translates into 8,600 deaths, 580,000 injuries, and $33 billion in property damage each year in the United States." Tina Wescott Cafaro, Slipping Through the Cracks: Why Can't We Stop Drugged Driving?, 32 W. New Eng. L. Rev. 33, 35 (2010). See also Robert L DuPont, M.D., Drugged Driving Research: A White Paper 4 (Mar. 31, 2011), http://stopdruggeddriving.org/pdfs/DruggedDrivingAWhitePaper.pdf (reporting that one-third of fatally injured drivers with known test results tested positive for drugs.).

four convictions in their lifetime, one of which was in the last five years. Wis. Stat. § 346.65(2)(am)4-4m. A fifth or subsequent offense results in a Class H felony for five or six convictions, a Class G felony for seven, eight, or nine convictions, and a class F felony for ten or more convictions. Wis. Stat. § 346.65(2)(am)5-7. These severe penalties for repeated violations of the statute "support an inference that the legislature did not intend to impose strict liability." See Jadowski, 272 Wis. 2d 418, ¶¶27-29. However, this factor is ultimately neutral because, though any convictions after the third offense are felonies, the first offense is a civil forfeiture, and the second and third offenses mandate only short jail sentences. Nevertheless, "any inference drawn from the severe penalties is outweighed by the other factors." See id., ¶29; Polashek, 253 Wis. 2d 527, ¶32 (noting that although six months of imprisonment indicates a crime of some seriousness, we have held that some felony criminal statutes impose strict liability).

¶73 We decline Luedtke's invitation to apply the rule of lenity. The rule of lenity states "that ambiguous penal statutes should be interpreted in favor of the defendant." State v. Cole, 2003 WI 59, ¶67, 262 Wis. 2d 167, 663 N.W.2d 700. We apply the rule of lenity only if "(1) the penal statute is ambiguous; and (2) [a court is] unable to clarify the intent of the legislature by resort to legislative history." Id. Here the statute is unambiguous and imposes strict liability. The

legislature did not include knowledge or intent as an element of the crime and thus, the rule of lenity does not apply.

¶74 Alternatively, Luedtke argues that, without scienter, the statute is unconstitutional and violates his substantive due process rights. "The Due Process Clauses of the United States and Wisconsin Constitutions protect both substantive and procedural due process rights." State ex rel. Greer v. Wiedenhoeft, 2014 WI 19, ¶55, 353 Wis. 2d 307, 845 N.W.2d 373 reconsideration denied sub nom., Greer v. Wiedenhoeft, 2014 WI 50, 354 Wis. 2d 866, 848 N.W.2d 861 (citation and quotations omitted). "Substantive due process provides protection from 'certain arbitrary, wrongful government actions.'" Id., ¶57 (citation omitted). "Substantive due process forbids a government from exercising 'power without any reasonable justification in the service of a legitimate governmental objective.'" State v. Radke, 2003 WI 7, ¶12, 259 Wis. 2d 13, 657 N.W.2d 66 (citation omitted). For these reasons, strict liability crimes may violate a person's substantive due process rights. Wayne R. LaFave, Substantive Due Process, 1 Subst. Crim. L § 3.3 (2d ed. 2013).

¶75 However, we presume that statutes are constitutional. Cole, 264 Wis. 2d 520, ¶11. Thus, we "indulge[] every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality." Id. (quoting Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶18, 237 Wis. 2d 99, 613 N.W.2d 849). A party asking this court to find

a statute unconstitutional has the burden to prove the statute's unconstitutionality beyond a reasonable doubt. State v. Wood, 2010 WI 17, ¶15, 323 Wis. 2d 321, 780 N.W.2d 63 (citation omitted).

¶76 We apply rational basis scrutiny to this statute because the statute does not implicate a fundamental right or suspect class. See State v. Smith, 2010 WI 16, ¶12, 323 Wis. 2d 377, 780 N.W.2d 90; Smet, 288 Wis. 2d 525, ¶¶21-26. Rational basis scrutiny is satisfied if the statute is rationally related to achieving a legitimate governmental interest. Smith, 323 Wis. 2d 377, ¶12. When faced with a substantive due process challenge, we examine "whether the statute is a reasonable and rational means to the legislative end." Smet, 288 Wis. 2d 525, ¶11.

¶77 In the present case, rational basis scrutiny is satisfied because the statute is rationally related to achieving public safety. Id., ¶17. We agree with the court of appeals that "[i]n addressing the problem of drugged driving, the legislature could have reasonably and rationally concluded that 'proscribed substances range widely in purity and potency and thus may be unpredictable in their duration and effect.'" Luedtke, 355 Wis. 2d 436, ¶17 (citation omitted). Though it may be more difficult to deter people from driving after unknowingly ingesting a restricted controlled substance, such drivers are at least as dangerous as those who knowingly ingest a restricted controlled substance. Further, because no "reliable measure" of impairment exists for many illicit drugs, the legislature could

have reasonably concluded that the more sensible approach was to ban drivers from having any amount in their systems. Smet, 288 Wis. 2d 525, ¶17. The legislature could rationally conclude that a strict liability, zero-tolerance approach is the best way to combat drugged driving. Ultimately, we are "satisfied that prohibiting operation of a motor vehicle while having a detectable amount of a restricted controlled substance in one's blood [without proof of scienter] bears a reasonable and rational relationship to the purpose or objective of the statute, and that the statute is not fundamentally unfair." Id., ¶20. Wisconsin Stat. § 346.63(1)(am) presents no due process violation and is constitutional.[20]

¶78 Therefore, because the statute is a strict liability offense and is constitutional, Luedtke is not entitled to a new trial in the interest of justice. Because the jury did not have to determine whether or not Luedtke knew he ingested cocaine, the real controversy was fully tried. Bannister, 302 Wis. 2d 158, ¶43.

IV. CONCLUSION

---

[20] Luedtke argues that the statute punishes those who accidentally ingest cocaine. He does not argue that he accidentally ingested cocaine. Luedtke merely argues that it was possible that it happened because "he does not use cocaine." Further, Luedtke cites to studies that show cocaine is present on paper currency and in lakes, but does not explain how such exposure could result in a positive blood test. We decline to address this undeveloped argument.

41

¶79 First, based on precedent, we hold that, in the context of evidence preservation and destruction, the Wisconsin Constitution does not provide greater due process protection under Article 1, Section 8, Clause 1 than the United States Constitution under either the Fifth or Fourteenth Amendments. As a result, Youngblood controls. Accordingly, in order to prevail, Luedtke and Weissinger must show that the State (1) failed to preserve evidence that was apparently exculpatory, or (2) acted in bad faith by failing to preserve evidence that was potentially exculpatory. Greenwold II, 189 Wis. 2d at 67. Luedtke and Weissinger's blood samples were neither apparently exculpatory nor destroyed in bad faith; therefore, the State did not violate their due process rights.

¶80 Second, we hold that operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood under Wis. Stat. § 346.63(1)(am) is a strict liability offense that does not require scienter, and is constitutional. We therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals in each of the two cases is affirmed.

¶81 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* The issue before the court is whether the State violated the defendants' due process rights (protected under the Wisconsin Constitution) when a laboratory, following routine practice, destroyed the defendants' blood samples. Neither defendant had an opportunity to independently test his sample.

¶82 These cases raise the broader question of the capacity of the defendant, as a matter of due process law, to gain access to evidence the defendant may use at trial.

¶83 The court takes two approaches in deciding that the defendants lose:

¶84 The first approach is to deny that the Wisconsin constitution offers greater protection than the United States Constitution. Rather, the court holds that the United States Supreme Court decision in Arizona v. Youngblood, 488 U.S. 51 (1988), interpreting the federal constitutional due process guaranty, applies to the Wisconsin constitutional guaranty of due process.

¶85 The second approach is to assert that the court is bound, under the doctrine of stare decisis, by its prior decisions adopting Youngblood.

¶86 I take a third approach to the present cases. I do not rely on the due process clause of the Wisconsin Constitution. I would require that hereafter a circuit court is to instruct the fact finder in cases like the instant cases that the fact finder may, but need not, infer that the destroyed

evidence would have been favorable to the defense. If hereafter such a jury instruction is not given, the cause should be remanded for a new trial.

I

¶87 First, I disagree with the court's persistent antipathy to construing the Wisconsin Constitution's Declaration of Rights differently from the way the United States Supreme Court construes an analogous provision in the federal constitution. Federal jurisprudence is persuasive and helpful, but this court must make an independent judgment considering competing principles and policies under the Wisconsin Constitution.

¶88 We should follow our earlier precedent regarding interpretation of the Wisconsin Constitution. Ten years ago, the court emphasized that the similarity between the language in the Wisconsin Constitution and the language in the United States Constitution is not conclusive.

- In State v. Knapp, 2005 WI 127, ¶60, 285 Wis. 2d 86, 700 N.W.2d 899, the court stated: "While textual similarity or identity is important when determining when to depart from federal constitutional jurisprudence, it cannot be conclusive, lest this court forfeit its power to interpret its own constitution to the federal judiciary. The people of this state shaped our constitution, and it is our solemn responsibility to interpret it. Federal jurisprudence is persuasive and helpful, but we must

save independent judgment for considering competing principles and policies under the Wisconsin Constitution."[1] (Citation omitted.)

- In <u>State v. Dubose</u>, 2005 WI 126, ¶41, 285 Wis. 2d 143, 699 N.W.2d 582, the court stated: "[W]hile this results in a divergence of meaning between words which are the same in both federal and state constitutions, the system of federalism envisaged by the United States Constitution tolerates such divergence where the result is greater protection of individual rights under state law than under federal law. . . ." (Quoted source omitted.)

¶89 In keeping with my oath of office to support the Wisconsin Constitution and the Constitution of the United States, I adhere to <u>Knapp</u> and <u>Dubose</u> and to <u>State v. Doe</u>, 78 Wis. 2d 161, 172, 254 N.W.2d 210 (1977), decided more than 35 years ago: The court "will not be bound by the minimums which are imposed by the Supreme Court of the United States if it is the judgment of this court that the Constitution of Wisconsin and the laws of this state require that greater protection of citizen's liberties ought to be afforded."

---

[1] See <u>State v. Knapp</u>, 2005 WI 127, ¶¶55-81, 285 Wis. 2d 86, 700 N.W.2d 899; <u>id.</u>, ¶¶84-94 (Crooks, J., concurring, joined by Abrahamson, C.J., Bradley, J., & Butler, J.). Justice Crooks relied on <u>Davenport v. Garcia</u>, 834 S.W. 2d 4, 12 (Tex. 1992), declaring: "When a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights."

¶90 The court must make this judgment in each case.

¶91 The majority opinion applies <u>Arizona v. Youngblood</u> to interpret the Wisconsin constitution. <u>Youngblood</u> is a troublesome case.

                                    II

¶92 Second, the majority opinion relies on Wisconsin precedent. <u>See</u> <u>State v. Greenwold</u> (<u>Greenwold II</u>), 189 Wis. 2d 59, 68-69, 525 N.W.2d 294 (Ct. App. 1994).

¶93 Stare decisis, "let the decision stand," is an essential bedrock principle in our system of justice. To overrule precedent requires special justification. "A court must keep in mind that it does 'more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.'"[2]

¶94 The court has set forth the following factors that typically contribute to a decision to overturn prior case law:

- Changes or developments have undermined the rationale behind a decision;
- There is a need to make a decision correspond to newly ascertained facts;
- There is a showing that the precedent has become detrimental to coherence and consistency in the law;
- The prior decision is "unsound in principle;"
- The prior decision is "unworkable" in practice;
- The prior decision was not correctly decided; and

---

[2] <u>Bartholomew v. Wis. Patients Comp. Fund</u>, 2006 WI 91, ¶34, 293 Wis. 2d 38, 717 N.W.2d 216.

- The prior decision has not produced a settled body of law.[3]

¶95 These factors are sufficiently implicated in the present case to justify overturning Greennwold, as demonstrated by Judge Brown's concurrence and Judge Reilly's dissent in the Weissinger decision in the court of appeals.

¶96 Judge Brown wrote in concurrence: Youngblood "sets up an illusion. . . . The bad faith component devised by the Supreme Court sets such a high bar, it is virtually impossible to overcome."[4] Judge Brown compiled a comprehensive review of criticism levied against the Youngblood bad faith requirement by state courts and commentators alike.[5] The fact that only 7 out of 1,500 published cases citing Youngblood found bad faith illustrates the inherent unfairness in the Youngblood test.

¶97 Judge Reilly wrote in dissent: "A criminal justice system that allows the government to destroy the sole evidence of a person's guilt prior to notice, charging, or a meaningful opportunity for the accused to inspect the State's evidence is fundamentally unfair."[6]

---

[3] Johnson Controls, Inc. v. Employers Ins. Of Wausau, 2003 WI 108, ¶¶94, 99, 100, 264 Wis. 2d 60, 665 N.W.2d 257.

[4] State v. Weissinger, 2014 WI App 73, ¶29, 355 Wis. 2d 546, 851 N.W.2d 780 (Brown, C.J., concurring).

[5] See id., ¶30, n.1 (Brown, C.J., concurring).

[6] Weissinger, 355 Wis. 2d 546, ¶31 (Reilly, J., dissenting).

¶98 I share these judges' unease with the federal standard set forth in Youngblood (and adopted by Wisconsin case law).[7]

¶99 The Youngblood and Greenwold II decisions do not give meaningful protection to a defendant. "Ironically, the rule of law established by [Youngblood] was founded upon the conviction of an innocent man."[8]

¶100 There is an emerging consensus among courts that have considered the issue that the bad faith standard does not go far enough to protect adequately the rights of a person charged with a crime. I agree with those courts that viewed the bad faith requirement as a "potentially bottomless pit for a defendant's interest in a fair trial, and stepped back from the brink."[9] I take a third approach to the instant cases.

III

¶101 I conclude that under the circumstances of these cases the court should moderate Youngblood and Greenwold. One way of

---

[7] State v. Greenwold, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994) (Greenwold II); see majority op., ¶53.

[8] Norman C. Bay, Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith, 86 Wash. U. L. Rev. 241, 243 (2008). See also 6 Wayne R. LaFave, Criminal Procedure § 24.3(e) at 388-89 (3d ed. 2007).

[9] Cost v. State, 10 A.3d 184, 195 (Md. 2010).

Numerous states have rejected Arizona v. Youngblood, on state constitutional grounds. Cynthia E. Jones, The Right Remedy for the Wrongly Convicted: Judicial Sanctions for Destruction of DNA Evidence, 77 Fordham L. Rev. 2893 (2009); Norman C. Bay, Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith, 86 Wash. U. L. Rev. 279 (2008); Illinois v. Fisher, 540 U.S. 544, 549 n.* (2004) (Stevens, J., concurring).

helping to alleviate the concern about destroyed evidence and ease the fundamental unfairness of the Youngblood bad-faith requirement is to require an instruction that states that the fact finder may, but need not, infer that evidence destroyed would have been favorable to the defense.[10]

¶102 This court often governs evidence in the circuit courts and requiring a curative instruction is not unusual in Wisconsin law.[11] Indeed, this court relies on curative instructions with frequency. A curative instruction has been adopted by courts in other states in cases like the present cases.[12]

¶103 If hereafter such a jury instruction is not given in cases such as the instant cases, the cause should be remanded for a new trial.

¶104 I favor this approach because there should be consequences for even innocent or negligent loss or destruction

---

[10] The instruction I propose would not be given when it is necessary for the sample to be destroyed to perform the test. See State v. Ehlen, 119 Wis. 2d 451, 351 N.W.2d 503 (1984).

[11] This court has superintending authority over all courts. Wis. Const. art. VII, § 3(1). See In re Jerrell C.J., 2005 WI 105, ¶3, 48, 283 Wis. 2d 145, 699 N.W.2d 110; see also id., ¶¶71-94, (Abrahamson, C.J., concurring); Arneson v. Jezwinski, 206 Wis. 2d 217, 226, 556 N.W.2d 721 (1996) ("'The superintending power is as broad and as flexible as necessary to insure the due administration of justice in the courts of this state.'" (citation omitted)).

[12] See, e.g., People v. Handy, 988 N.E. 2d 879, 882 (N.Y. 2013) ("An adverse inference charge mitigates the harm done to defendant by the loss of evidence without terminating the prosecution."); State v. Glissendorf, 329 P.3d 1049 (Ariz. 2014) (instruction regarding inference is required under state law).

7

of evidence to deter the State from losing or destroying evidence and to ensure that defendants do not bear the total burden of the State's conduct.[13] The inference instruction takes into account the State's explanation of the destruction of the evidence by permitting the fact finder to draw an adverse inference from the destruction when the fact finder determines that the State's explanation of the loss or destruction is inadequate.

¶105 Finally, I note that the invocation of a curative instruction is especially important in light of recent cases developing the law of evidence in this state. It is arguable that defendants are being given fewer and fewer opportunities to assess evidence against them.

¶106 For example, in State v. O'Brien, 2014 WI 54, ¶49, 354 Wis. 2d 753, 850 N.W.2d 8, the court upheld the use of hearsay evidence at preliminary hearings, thus reducing a defendant's right of cross-examination. In State v. Griep, 2015 WI ___, ___ Wis. 2d ___, ___ N.W.2d ___, the court concludes that the State does not violate the federal and state constitutional confrontation clauses by not calling as a witness the person who tested the defendant's blood at the laboratory and filed the report.

---

[13] For a discussion of mistakes made in crime laboratories, a failing score of the Wisconsin State Laboratory of Hygiene, and the limitations on the defendant in cross-examination, see Judge Reilly's dissent in Weissinger, 355 Wis. 2d 546, ¶¶44-45.

¶107 If the defendant's ability to cross-examine witnesses is being reduced, there is all the more reason to be sure that a defendant has the opportunity to independently test blood and challenge the State's evidence of the blood sample.

¶108 I concur (rather than dissent) because this instruction was not required at the time these cases were tried. Argument was made by counsel about missing evidence, but an instruction has more force and effect because it carries the imprimatur of a judge.[14]

¶109 For the reasons set forth, I write separately.

---

[14] Cost v. State, 10 A.3d 184, 196-97 (Md. 2010).