COURT OF APPEALS
DECISION
DATED AND FILED

June 22, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1594-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF15

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

LOREN T. RUZIC,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Clark County: THOMAS T. FLUGAUR, Judge. *Affirmed*.

Before Blanchard, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  A jury found Loren Ruzic guilty of third-degree sexual assault of A.B.[1]  Ruzic filed a motion for postconviction relief alleging that his trial counsel was constitutionally ineffective for failing to impeach witnesses, to object to evidence, and to present evidence at trial regarding certain issues. Ruzic filed a supplemental motion for postconviction relief alleging, in addition, that the State failed to preserve and disclose text messages in violation of his right to due process, and that his trial counsel was constitutionally ineffective for inadequately addressing the text message evidence and failing to impeach witnesses and present evidence regarding other issues.  The circuit court held an evidentiary hearing after each motion and denied both motions.

¶2    On appeal, Ruzic argues that the State failed to preserve and disclose text messages in violation of his right to due process and that his trial counsel provided constitutionally ineffective assistance in nine respects.  We reject Ruzic's arguments and affirm the circuit court.[2]

## BACKGROUND

¶3    In January 2017, A.B. reported to an officer at the City of Greenwood Police Department that her ex-husband, Ruzic, sexually assaulted her

---

[1]  To protect the dignity and privacy of the victim, we refer to her as A.B., using initials that do not correspond to her real name.  *See* WIS. STAT. RULES 809.19(1)(g) and 809.86 (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2]  The trial took place in January 2018; the circuit court imposed sentence in April 2018; and, after holding evidentiary hearings on Ruzic's initial and supplemental motions for postconviction relief, the court entered an order denying the motions in May 2020.  Ruzic was released from prison in July 2020.  After receiving multiple extensions of the deadline to file a notice of appeal, Ruzic timely filed a notice of appeal in September 2021.  After both parties received extensions of the briefing deadlines, the parties completed the briefing of this appeal in September 2022.

at their then-residence in December 2014, when they were still married. A.B. told the officer that Ruzic became upset with her when he returned home from work and found that their home's pipes had frozen because she had not kept the wood burner lit. A.B. said that Ruzic hit his head against and punched the wall, which left a hole in the wall. A.B. said that the following day, Ruzic told her he was still upset with her and he "raped her and then ejaculated onto her face." A.B. said that she was too scared to tell Ruzic "no." After Ruzic ejaculated onto A.B.'s face, A.B. said that she began to cry, pushed Ruzic off of her, and ran into the shower. A.B. said that only she, Ruzic, a mutual friend of theirs, and Ruzic's brother and sister-in-law were aware of the alleged sexual assaults.

¶4 After A.B. spoke with the officer, the officer interviewed Ruzic's sister-in-law, Ruzic's brother, and A.B. and Ruzic's mutual friend, and then contacted Ruzic and asked to "speak with" him. Ruzic met the officer at the Greenwood Police Department. Ruzic told the officer that he remembered when the pipes froze and that he was very upset and made a hole in the wall of the house. He denied sexually assaulting A.B. He said that A.B. agreed to the sexual conduct that A.B. had described and that she was making these allegations because of an ongoing child custody dispute and "to make herself look better" for the guardian ad litem. Ruzic also said that the incident took place in January 2015, not December 2014.

¶5 The State charged Ruzic with one count of second-degree sexual assault based on the alleged nonconsensual sexual intercourse, and one count of third-degree sexual assault based on the alleged nonconsensual ejaculation, both as domestic abuse.

¶6      During a two-day trial, the following witnesses testified:  A.B., the officer who investigated A.B.'s allegations, Ruzic's sister-in-law, Ruzic's brother, A.B. and Ruzic's mutual friend, A.B.'s father, Ruzic's mother, and Ruzic.  Ruzic's defense at trial was that the sexual intercourse and ejaculation and the surrounding circumstances as testified to by A.B. occurred, but that A.B. consented to both the sexual intercourse and ejaculation; that the incident took place in January 2015 not December 2014, which, among other details that A.B. inaccurately recalled, cast doubt on her credibility; and that A.B. reported her allegations to the police two years later only to gain advantage in the ongoing custody disputes at that time. We will present pertinent details of the trial testimony and evidence in the discussion that follows.

¶7      The jury found Ruzic not guilty of the second-degree sexual assault count and guilty of the third-degree sexual assault count.

¶8      Ruzic filed a motion for postconviction relief seeking a new trial based on the alleged ineffective assistance of counsel, and the circuit court held an evidentiary hearing on the motion.  Ruzic filed a supplemental motion for postconviction relief asserting additional allegations of ineffective assistance of counsel and a due process claim based on the alleged failure of the State to preserve and disclose text messages, and the court held a separate evidentiary hearing on that motion.  The court subsequently issued an order denying both motions "for the reasons stated on the record at the hearings" at which the court issued rulings on the motions.

¶9      Ruzic appeals.

## DISCUSSION

## I.  DUE PROCESS CLAIM

¶10    Ruzic argues that the State failed to obtain, preserve, and disclose relevant text messages between A.B. and Ruzic in violation of his right to due process.  After stating the applicable law and standard of review, we present additional pertinent background and relevant parts of the circuit court's oral ruling on this issue.  We next explain why we conclude that Ruzic has not shown that the State failed to preserve exculpatory evidence in violation of his right to due process.

¶11    The due process clauses of both the United States Constitution and the Wisconsin Constitution impose a duty on the State to preserve exculpatory evidence.  *State v. Luedtke*, 2015 WI 42, ¶¶39, 41, 45, 53, 362 Wis. 2d 1, 851 N.W.2d 592 (citing *State v. Greenwold*, 181 Wis. 2d 881, 885, 512 N.W.2d 237 (Ct. App. 1994) (*Greenwold I*).  "The state's duty to preserve exculpatory evidence is limited to evidence that 'might be expected to play a significant role in the suspect's defense.'"  *State v. Hahn*, 132 Wis. 2d 351, 358, 392 N.W.2d 464 (Ct. App. 1986) (quoting *State v. Oinas*, 125 Wis. 2d 487, 490, 373 N.W.2d 463 (Ct. App. 1985)) (citing *California v. Trombetta*, 467 U.S. 479, 488 (1984)).

¶12    The State's failure to preserve evidence violates a defendant's right to due process if the State:  "(1) failed to preserve evidence that was apparently exculpatory, or (2) acted in bad faith by failing to preserve evidence that was potentially exculpatory."  *Luedtke*, 362 Wis. 2d 1, ¶¶14, 39, 53 (citing *State v. Greenwold*, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994) (*Greenwold II*), and *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)).

¶13    The first prong of the due process test addresses apparently exculpatory evidence, and requires that the defendant show both that the evidence had an exculpatory value that was apparent to those who had custody of the evidence before it was lost, and that the defendant cannot obtain comparable evidence by other reasonably available means. *State v. Munford*, 2010 WI App 168, ¶21, 330 Wis. 2d 575, 794 N.W.2d 264; *Greenwold II*, 189 Wis. 2d at 67-69 (citing *Trombetta*, 467 U.S. at 489). The second prong of the due process test addresses potentially exculpatory evidence and requires that the defendant show bad faith; the defendant can show bad faith only if: "'(1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; and (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence.'" *Luedtke*, 362 Wis. 2d 1, ¶46 (quoting *Greenwold II*, 189 Wis. 2d at 69). It is the defendant's burden to prove that the evidence was apparently and not merely potentially exculpatory under the first prong, *Munford*, 330 Wis. 2d 575, ¶21, or that it was potentially exculpatory and not preserved through bad faith conduct under the second prong, *see Greenwold II*, 189 Wis. 2d at 69–70. *See also Luedtke*, 362 Wis. 2d 1, ¶¶7, 46 (stating that "the defendant must show" that one of the prongs is met).

¶14    The remedy for a due process violation based on the State's failure to preserve exculpatory evidence is for the circuit court, in the exercise of its discretion, to "choose between barring further prosecution or suppressing ... the State's most probative evidence." *Hahn*, 132 Wis. 2d at 361 (quoting *Trombetta*, 467 U.S. at 487).

¶15    We uphold the circuit court's factual findings unless they are clearly erroneous. *Luedtke*, 362 Wis. 2d 1, ¶37. We review de novo whether the State's failure to preserve evidence violated the defendant's right to due process. *Id.*

*A. Additional Background*

¶16     During trial, the prosecution offered, and the circuit court admitted into evidence, five exhibits displaying screenshots of text messages between A.B. and Ruzic that law enforcement had photographed on A.B.'s phone.  As reproduced below, the text messages regard the alleged sexual assaults that took place in December 2014 or January 2015; the text messages themselves show dates between January and November 2016.

> **Exhibit 3:  January 18, 2016.**
>
> Ruzic:  I said we were gonna have sex and you may not like it and you said yes.  What I did by cumming on you was totally unjust and the most horrendous thing I've ever could[']ve done to you
>
> A.B.:  I didn't say a damn thing because you scared the hell out of me.  I was more afraid of you then than I was the day before.  It was rape, and it was sexual abuse.
>
> Ruzic:  You agreed hun and don't give that bs
>
> And I didn't hold you down nor do anything different too you besides cumming on you.  And you know that
>
> The two most terrible things I've ever done was the hole and my di[s]respect for my wife that night
>
> A.B.:  I didn't agree and you know it.  I couldn't even fucking move.
>
> There's no fixing that.
>
> **Exhibit 4:  January 18, 2016.**
>
> Ruzic:  There's is no fixing that I know that dear but I did not rape you in your bed you said yes  never once in my life did I hold you against your will, not once.  I'd step toe to toe with a grizzly to take that dreadful night back
>
> I promised I'd never lay a hand on you and I've never did
>
> My life could I have thought i[']d disrespect you like that never dear

A.B.:  And yet you want me to come back.

What would happen if I did something to piss you off again?  I'm not waiting around for that to happen again.

Ruzic:  I promised from that night on I would never do that ever to you, you should never forgive me of that and that will tear me to pieces inside me but I can't even imagine to think of never telling u I love you again for always.

I have never shown anything of that nature to you or too anybody in my life

**Exhibit 5:  February 1, 2016.**

A.B.:  I lied about one thing [keeping the wood burner lit]. You lied about so much stuff I lost count.  And I am allowed to walk away when I am tired of being hurt and degraded by you.  Especially when it would happen in front of the kids.  You don't get to decide that you didn't hurt me.  You hurt me on so many levels.

Ruzic:  I hate myself for what I did to you.  I never meant it, to use you the way I did you deserve a great man.  And I[']m still him.  I love you  night

You deserve to hate me  I wasn't worthy for you

**Exhibit 6:  April 8, 2016.**

Ruzic:  If I hadn't said those words the way I did.  If I just would've not disrespected my wife by cumming on your face, but I didn't force you into sex that night.

A.B.:  I am not going to discuss this again.

**Exhibit 7:  November 24, 2016.**

Ruzic:   I never once treated u wrong ever before that dreadful night  the real you needs someone like me.  A simple walk or talk

¶17     At the evidentiary hearing on Ruzic's supplemental postconviction motion ("the second hearing"), the investigating officer testified in pertinent part as follows.  In November 2017, before trial and at the prosecutor's direction, the officer contacted A.B. to discuss text messages appearing on her phone.  The

officer asked A.B. to take her phone to the police department to have the messages on her phone photographed, and she did so. A.B. told him that she had deleted some, to "clean up her messages," and the officer instructed A.B. not to delete any more messages. In a follow-up call to A.B. later in November 2017, the officer discussed an additional text message exchange between the two that Ruzic had provided to the prosecutor. This exchange involved only a discussion of the ongoing child custody problems between A.B. and Ruzic, with no references to the alleged sexual assaults. We refer to this as the "custody-dispute exchange." A.B. told the officer that she had deleted that custody-dispute exchange.

¶18 The officer did not take any steps to retrieve any of the messages on A.B.'s phone that she told police she had deleted.

¶19 In support of his postconviction motions, Ruzic submitted the investigating officer's supplemental report dated November 27, 2017. The report stated the following. Before the officer first contacted A.B. in November 2017, the prosecutor forwarded to him an email from A.B. Attached to the forwarded email were screenshots of a text message exchange between Ruzic and A.B. dated January 18, 2016. The prosecutor asked the officer to follow up with A.B. about getting the text messages on her phone photographed by law enforcement. The officer contacted A.B. and told her to go to the police department and have the police photograph the text messages on her phone. The officer also asked A.B. "how the topic [of the alleged sexual assaults] had gotten brought up." A.B. explained that Ruzic "would always bring things up while talking about the kids," and she was deleting messages and "was trying to 'clean up' her messages so it only shows the messages that we would need." The report does not further explain what A.B. meant by "things" that Ruzic brought up. The officer told A.B. not to delete any more messages, and she agreed that she would not.

9

¶20    Also in support of his motions, Ruzic's counsel submitted an affidavit in which counsel averred that, if called, Ruzic would testify that in February or March 2016 Ruzic sent A.B. a text message asking, "Why did you say yes?" to which A.B. allegedly replied, "I wish I wouldn't have, but I was trying to make up with you."

¶21    At the second hearing, Ruzic's trial counsel testified that he asked Ruzic to show counsel the alleged "why did you say yes" text message exchange, and that Ruzic said that he looked and did not have it and it must have been "on the other phone."  Ruzic testified that the alleged "why did you say yes" text message exchange occurred in January or February 2016.  He testified that he broke his phone in April or May 2016, and that he went to Verizon and was told that Verizon could not access text messages on his broken phone.  Ruzic testified that he asked trial counsel to obtain the alleged "why did you say yes" text message exchange from A.B.'s phone.

¶22    Also at the second hearing, the investigating officer testified that Ruzic never told the officer that Ruzic had a text message saying that A.B. consented, and that Ruzic's counsel did not contact the officer and ask him to find such a text message.

¶23    To aid the reader, we summarize the pertinent timeline as follows. The alleged sexual assaults occurred in December 2014 or January 2015.  Ruzic and A.B. separated in July 2015.  A.B. filed for divorce in August 2015 and the divorce was finalized in April 2016.  The custody-dispute exchange that Ruzic provided to the prosecutor was dated August and September 2016.  A.B. reported the alleged sexual assaults to police in January 2017.  The police photographed text messages on A.B.'s phone in November 2017, at which time A.B. told the

police that she had deleted messages so that her phone showed only messages "that we would need." The photographed text messages that the prosecution presented at trial were dated January 18, 2016, February 1, 2016, April 8, 2016, and November 24, 2016, as quoted in full above. Ruzic testified at the second hearing that the alleged additional, undisclosed "why did you say yes" text message exchange was dated January or February 2016, and that Ruzic broke his phone in April 2016, but his testimony at the second hearing about Ruzic's inability to obtain the alleged "why did you say yes" exchange was discredited by the circuit court.

### B. Circuit Court's Oral Ruling

¶24 Without objection by the defense, the circuit court characterized Ruzic's argument as follows: A.B. informed police that she had deleted text messages from her phone and the State should have recognized, from her statement that she had kept only the text messages "that we would need," that she had in fact deleted exculpatory text messages from her phone, and therefore the police should have lawfully obtained A.B.'s phone and conducted a forensic analysis of it that would reveal the deleted messages.

¶25 The circuit court determined that Ruzic failed to meet his burden under either prong of the due process test. Addressing the first prong, the court first found that the prosecution had disclosed to the defense and presented at trial many exculpatory text messages on A.B.'s phone. The court further found that Ruzic failed to show that A.B.'s phone contained additional deleted apparently exculpatory text messages, including the alleged "why did you say yes" exchange. The court reasoned that the asserted exculpatory value of the deleted messages would not have been apparent to the State because Ruzic did not mention the

11

existence of exculpatory messages to the officer in January 2017. The court noted that the only specific indication that such exculpatory evidence existed was Ruzic's postconviction testimony at the second hearing about the "why did you say yes" message, and there was no corroboration of that message.

¶26 The circuit court further found that Ruzic failed to show that any apparently exculpatory text messages that were deleted from A.B.'s phone were not available to Ruzic on his phone. The court credited evidence that A.B. still had access in November 2017 to all of the 2016 messages, and the court discredited Ruzic's testimony that he was not able to access the text messages.

¶27 Under the second prong of the due process test, the circuit court determined that Ruzic failed to show that the State acted in bad faith in not preserving any potentially exculpatory text messages, in addition to the exculpatory text messages that the State had preserved, disclosed to the defense, and presented at trial. The court found that the State did not know about the additional exculpatory alleged "why did you say yes" text message exchange until Ruzic filed his motions for postconviction relief and the court implicitly determined that the State had no reason to know about the allegation before then. The court credited the officer's testimony that Ruzic never mentioned the "why did you say yes" text message exchange when Ruzic spoke with the officer in January 2017.

## C. Analysis

¶28 We understand Ruzic to be arguing that the deleted text messages were apparently exculpatory or potentially exculpatory as to two topics: (1) to the extent that they address the alleged sexual assaults, they would support Ruzic's defense that A.B. consented to both the sexual intercourse and ejaculation; and

12

(2) to the extent that they address the ongoing custody dispute, they would support Ruzic's statement to the officer that A.B. made up the allegations to gain advantage in that dispute. We address, in turn, the two prongs of the due process test as to each of these topics.

### 1. Apparently Exculpatory

¶29    Under the first prong of the due process test, to the extent that the deleted text messages address the alleged sexual assaults, Ruzic fails to show that the circuit court erroneously determined that any deleted text messages were both not apparently exculpatory and not available to him. *See Munford*, 330 Wis. 2d 575, ¶21 (as to apparently exculpatory evidence, a defendant must show that the evidence had an exculpatory value that was apparent to those who had custody of the evidence before it was lost and that the defendant cannot obtain comparable evidence by other reasonably available means).

¶30    The testimony at the second hearing credited by the circuit court, in rulings that Ruzic does not show are clearly erroneous, demonstrated that the officer was not aware of the alleged existence of any exculpatory text messages until police photographed messages on A.B.'s phone in November 2017. As trial counsel testified at the second hearing and the circuit court found, the messages photographed on A.B.'s phone at that time, which were produced to the defense and shown at trial, were exculpatory as well as inculpatory. In November 2017 the officer also knew that, according to A.B., Ruzic had at times brought up other "things" when addressing custody matters in text messages, and that A.B. had deleted messages, as she put it, to "clean up" the messages on her phone and leave only those "that we would need." Given the context, the court had an evidentiary basis to find that the officer reasonably believed that A.B. had deleted messages

regarding custody and other matters not involving the alleged sexual assaults and left messages regarding the alleged sexual assaults. Supporting this finding was testimony by the officer, credited by the court, that Ruzic did not mention any exculpatory text messages when denying the allegations of nonconsensual sexual activity in January 2017. Based on these findings, before trial the officer had reason to believe that additional messages about the alleged sexual assaults, particularly exculpatory messages, were not among the messages that A.B. deleted.

¶31    Ruzic argues that A.B.'s remark that she was trying to "clean up" her text messages to show only the messages "that we would need" should have strongly implied to the officer that she deleted messages about the alleged sexual assaults that did not support her claim that she did not consent. That is a possible implication if one focuses on those words alone. However, this argument ignores the full context of A.B.'s statement, as well as the circuit court's credibility determinations.

¶32    To repeat, the court credited the officer's testimony that he asked A.B. how the alleged sexual assaults came up in the text messages that A.B. had provided to the prosecutor, and A.B. told the officer that Ruzic tended to bring up other "things" in the midst of addressing custody matters and made the "that we would need" remark quoted above. The context is one that reasonably supports the inference that the court drew, namely, that A.B. truthfully told the officer that she deleted messages that related exclusively to custody and other matters so that only the messages relating to the alleged sexual assaults remained. The court's assessment of the "that we would need" concept is supported by the evidence that she later told the officer that she had deleted the August and September 2016 custody-dispute exchange that was on Ruzic's phone that Ruzic provided to the

prosecutor, and also that she in fact produced messages that could be interpreted to show that she did consent. Stepping back, the fact that she freely admitted to the officer that she had deleted messages also supports the court's findings. We conclude that Ruzic has failed to show that any exculpatory value of the deleted messages, so far as they might address the alleged sexual assaults, was apparent to the officer before trial.

¶33 Even if Ruzic could show that the text messages that A.B. reported deleting had apparently exculpatory value, Ruzic fails to establish that the circuit court erroneously found that Ruzic did not show that any deleted text messages about the alleged sexual assaults were not available to him. To review, the State disclosed text messages that police photographed on A.B.'s phone in November 2017, and the disclosure included messages from as early as January 2016. Thus, messages from January 2016 were still on A.B.'s phone in November 2017. Ruzic failed to show that he could not also, in November 2017, have obtained text messages from January 2016 on his phone. He testified at the second hearing that his provider told him it could not do so, but the circuit court found his testimony

on this point both not credible and unsubstantiated.[3] We are bound by the circuit court's findings of fact and credibility. *See* **Hahn**, 132 Wis. 2d at 356-57 (we uphold circuit court's findings of fact); **State v. Randall**, 2011 WI App 102, ¶14, 336 Wis. 2d 399, 802 N.W.2d 194 (we defer to the circuit court's credibility determinations). In addition, as noted, the last of the messages disclosed by the prosecution was dated November 2016, and Ruzic failed to show that, had the court credited his testimony, any missing text messages from the time he obtained his new phone (after his old phone allegedly broke in April or May 2016) were not available to him on that phone. Indeed, Ruzic produced a text message exchange from his new phone dated August and September 2016. Ruzic fails to show that the circuit court erroneously found that Ruzic did not demonstrate that any text messages about the alleged sexual assaults that may have been deleted from A.B.'s phone were not available to him.

---

[3] After the circuit court issued its ruling, Ruzic submitted an affidavit addressing the availability of the deleted text messages in the context of his ineffective assistance of counsel claim. Ruzic did not accompany the affidavit with a motion, and the court did not address the affidavit. In that affidavit, Ruzic's postconviction counsel averred that counsel had communicated with Ruzic's provider and learned that the provider did not preserve text messages on its servers beyond three to five days, after which text messages could be retrieved only from the user's phone, and that "billing records and call logs could only be obtained through a subpoena authorized by the court." As the State notes in its appellate brief, this submission was untimely, contained inadmissible hearsay, and did not satisfy the requirements for reconsideration. In his reply brief, Ruzic responds that the State did not object to this submission being part of the record and that the provider's response is a business record. However, Ruzic does not explain how the provider's response is a business record, how it supports Ruzic's testimony that his new phone did not contain the non-deleted text messages from January 2016 that were on his old phone and that he could not otherwise access the text messages on his old phone, or that the submission was or should have been considered by the court on reconsideration. Moreover, Ruzic does not address the relevance of this information from the provider given the fact that the circuit court found Ruzic's testimony about his broken phone to be not credible. Accordingly, we do not further address this submission.

¶34 Turning to the argument that there may have been apparently exculpatory deleted text messages involving the ongoing custody disputes, there are at least two problems with this argument. First, as the circuit court found, the defense received, and the jury was presented, with ample evidence of the incentive that A.B. had to falsely accuse Ruzic based on the litigation of their custody disputes, and Ruzic fails to show the potential materiality of additional details regarding the underlying custody disputes. Second, Ruzic has failed to show that the text messages that A.B. reported deleting from her phone were not available to him on his phone. A.B. testified about their custody disputes "from August of 2016 to the end of the year." Ruzic presented at trial the one custody-dispute exchange that he testified he was able to access from his new phone dated August and September 2016. Ruzic does not point to any evidence credited by the court showing that other text messages addressing custody disputes from and after August 2016 were not also available to him on his phone.

## 2. Potentially Exculpatory

¶35 Under the second prong of the due process test, we conclude that Ruzic fails to show that the circuit court erroneously found that the State did not act in bad faith in failing to preserve potentially exculpatory deleted text messages. To repeat, a defendant can show bad faith only if "the officers acted with official animus or made a conscious effort to suppress exculpatory evidence." *Greenwold II*, 189 Wis. 2d at 69. There is no bad faith when the police negligently, inadvertently, or carelessly failed to preserve evidence that is merely potentially exculpatory. *Id.* at 68-70. As part of the bad faith analysis, the defendant must also prove that the officers had knowledge of the potentially exculpatory nature of the evidence before it was destroyed. *Youngblood*, 488 U.S. at 56 n.*; *Greenwold II*, 189 Wis. 2d at 69.

¶36 Ruzic argues that the officer here acted in bad faith by "choosing not to pursue evidence with obvious potentially exculpatory value" and by making a "conscious effort to preserve incriminating messages and ignore the deleted, exculpatory messages." However, the record does not support Ruzic's assertion of "a conscious effort" to ignore obviously potentially exculpatory evidence.

¶37 To the extent that the deleted text messages might have concerned the issue of A.B.'s consent or nonconsent, the officer testified at the second hearing that, had Ruzic told him about a text message in which A.B. said she consented, the officer would have documented it in his report and followed up on it. The officer also testified that, from his review of the text messages on A.B.'s phone, he had no reason to believe that A.B. had deleted messages that showed she lied about not consenting, given that she was forthcoming about deleting messages. In addition, some of the text messages on A.B.'s phone that A.B. did not delete could be interpreted to mean that she consented. That is, because A.B. retained text messages that included messages that could be interpreted this way and told the officer that she had deleted messages other than those "that we would need," we cannot conclude that the officer was making "a conscious effort" not to preserve those messages; he had a reasonable basis to conclude that A.B. had not deleted additional messages concerning consent.

¶38 Our analysis is similar regarding deleted text messages that might have concerned the details of custody disputes. As explained above, trial testimony established that A.B. and Ruzic were involved in custody disputes "from August 2016 to the end of the year." Ruzic failed to show that he did not have on his new phone text messages from and after August 2016, well after he testified his old phone was broken. Indeed, shortly after learning that A.B. had deleted messages, the officer learned of the one specific custody-dispute exchange

that A.B. deleted only after it had been produced by Ruzic himself. Thus, when the officer became aware that A.B. deleted messages concerning custody disputes, even had the officer then recognized the connection between those messages and Ruzic's asserted fabrication defense, the officer had no reason to believe that Ruzic did not have all of those messages on his new phone. Ruzic points to no direct evidence that the officer consciously sought to suppress text messages to which Ruzic did not also have access. The record contains insufficient evidence to support Ruzic's argument that the officer acted with the "intent to deprive [Ruzic] of his opportunity to defend himself." *See **Luedtke**,* 362 Wis. 2d 1, ¶56.

¶39    The officer's deduction that A.B. did not delete text messages about the alleged sexual assaults and the officer's deduction that any deleted messages concerning custody disputes did not pertain to this case do not constitute "a conscious effort to suppress" messages favorable to Ruzic. *See **Greenwold II**,* 189 Wis. 2d at 69. On this record, Ruzic fails to establish that the circuit court erroneously found that he failed to meet his burden to show that the officer acted in bad faith when he did not arrange for a forensic search of A.B.'s phone to try to recover all text messages that she reported she deleted.

¶40    In sum, we conclude that Ruzic has failed to show that the State did not preserve exculpatory evidence in violation of his due process rights.[4]

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

¶41    Ruzic argues that his trial counsel provided constitutionally ineffective assistance by failing to: (1) move to compel a forensic examination of A.B.'s phone or take other efforts to obtain the deleted text messages; (2) move to exclude the text messages that A.B. did not delete; (3) impeach A.B. at trial or examine the officer at trial regarding the deleted text messages; (4) examine Ruzic at trial about the one exculpatory text message he asserted that A.B. deleted; (5) examine Ruzic at trial about his motivation for his conduct and his inculpatory text messages; (6) cross-examine at trial Ruzic's brother about when he confronted Ruzic; (7) challenge through examination at trial A.B. and Ruzic's mutual friend who testified differently from his statement to the officer; (8) impeach A.B. at trial about her testimony regarding the date of the incident involving the frozen pipes that was different from the date she testified to at a prior hearing in a separate case involving her petition for a harassment injunction; and (9) object to trial testimony that the harassment injunction was granted to A.B.

---

[4] The State argues that Ruzic's due process claim also fails because, among other things: Ruzic forfeited it by not timely raising it in the circuit court; there was no State action in that the State neither deleted the messages nor possessed A.B.'s phone after it learned that A.B. had deleted the messages; and Ruzic misplaces his reliance on *State v. Huggett*, 2010 WI App 69, ¶¶17-18, 324 Wis. 2d 786, 783 N.W.2d 675 (ruling that the State improperly failed to preserve voice mail messages on phones that it had seized when it was immediately aware of the apparently exculpatory value of the messages and knew the provider would at some point automatically delete them, thereby "creating an expectation of preservation"). Ruzic contests each of these arguments. We need not and do not reach these arguments because our conclusion that Ruzic's claim fails to meet the requirements of the due process test addressed in this opinion is dispositive. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶42 After stating the applicable law and standard of review, we address each asserted error in turn. We conclude, as to each asserted error, that Ruzic has failed to show that his trial counsel provided constitutionally ineffective assistance.

¶43 The United States Constitution guarantees to criminal defendants the right to effective assistance of counsel. *State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To demonstrate that counsel's assistance was ineffective, the defendant must establish both "that counsel's performance was deficient and that the deficient performance was prejudicial." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 (citing *Strickland*, 466 U.S. at 687). "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697; *see also Breitzman*, 378 Wis. 2d 431, ¶37 ("If the defendant fails to satisfy either prong [under *Strickland*], we need not consider the other."). The defendant bears the burden on both of these prongs. *State v. Roberson*, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111.

¶44 Counsel's performance is "constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). In other words, professionally competent assistance encompasses a "wide range" of conduct, and a reviewing court starts with the presumption that counsel's assistance fell within that wide range. *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires

that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* A defendant's burden is to show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

¶45 "We are 'highly deferential' to counsel's decisions, provided they are objectively reasonable and strategic." *State v. Mull*, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d. 707 (quoting *Breitzman*, 378 Wis. 2d 431, ¶65). "This court will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." *Breitzman*, 378 Wis. 2d 431, ¶65 (quoting *State v. Domke*, 2011 WI 95, ¶49, 337 Wis. 2d 268, 805 N.W.2d 364) (alteration in original). "On the other hand, it is not enough to merely 'label' counsel's challenged decisions 'a matter of choice and of trial strategy.'" *Mull*, 406 Wis. 2d 491, ¶36 (quoting *State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983)). "Rather, we examine trial counsel's choices 'in the context of the circumstances as they existed at the time [counsel] made [counsel's] decisions.'" *Mull*, 406 Wis. 2d 491, ¶36 (quoting *State v. Pico*, 2018 WI 66, ¶22, 382 Wis. 2d 273, 924 N.W.2d 95). Counsel's choice of strategy must be "objectively reasonable." *Mull*, 406 Wis. 2d 491, ¶35.

¶46 Counsel's deficient performance prejudiced the defense if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To prove prejudice, a defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. To

prove prejudice in an ineffective assistance case, "a defendant must establish that but for [trial counsel's] error, there is a reasonable probability [that] the jury would have had a reasonable doubt as to [the defendant's] guilt." **State v. Sholar**, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89. In other words, to establish prejudice, a defendant need not prove that the outcome "more likely than not" would have been different absent trial counsel's error. **Id.**, ¶44. While one error alone may not have prejudiced the defense, the cumulative effect of multiple errors may undermine a reviewing court's confidence in the outcome of the proceeding, "depend[ing] upon the totality of the circumstances at trial[.]" **Thiel**, 264 Wis. 2d 571, ¶¶60-2.

¶47 "Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact." **State v. Maday**, 2017 WI 28, ¶25, 374 Wis. 2d 164, 892 N.W.2d 611. The circuit court's findings of fact will not be disturbed unless those findings are clearly erroneous. **Id.** "'The circumstances of the case and … counsel's conduct and strategy' are considered findings of fact." **Id.** (citation omitted). However, whether those facts constitute deficient performance and whether such deficient performance was prejudicial are questions of law that we review independently. **State v. Tulley**, 2001 WI App 236, ¶5, 248 Wis. 2d 505, 635 N.W.2d 807.

### A. Errors 1-4: Inadequately Addressing Deleted Text Messages

¶48 The first four asserted errors concern the deleted text messages. To repeat, the following timeframe is relevant to these errors. The alleged sexual assaults occurred in December 2014 or January 2015. Ruzic and A.B. exchanged text messages about the alleged sexual assaults from January to November 2016. Ruzic and A.B. were involved in custody disputes from August 2016 to the end of

the year. A.B. reported the alleged sexual assaults to police in January 2017. In November 2017, Ruzic's counsel received from the prosecution the January to November 2016 messages on A.B.'s phone. At the same time Ruzic's counsel learned that A.B. told police that she had deleted the one custody-dispute exchange that Ruzic produced dated August and September 2016, as well as some other messages that she said involved custody and other matters. At some point before the January 2018 trial, counsel also learned from Ruzic about his allegation of the additional "why did you say yes" text message exchange, which he said was dated January or February 2016, and that Ruzic said he could not produce that alleged exchange.

¶49 The first error asserted by Ruzic is that trial counsel provided constitutionally ineffective assistance by failing to move to compel a forensic examination of A.B.'s phone or to notify the prosecutor "of the specific exculpatory messages he believed were deleted from [A.B.'s] phone," thereby triggering the prosecutor's duty to retrieve those messages. This argument is premised on his assertion that counsel "was well aware of the exculpatory messages that [A.B.] deleted from her phone." This assertion is premised, in turn, on counsel's testimony that Ruzic had told him about the alleged "why did you say yes" text message and that counsel was aware that A.B. had deleted the August and September 2016 custody-dispute exchange and other messages that she said involved custody and other matters.

¶50 However, the testimony on which Ruzic relies does not show that counsel ever believed, or had reason to believe, that A.B. deleted the specific "why did you say yes" message alleged by Ruzic or that the other messages A.B. deleted were exculpatory, as opposed to simply reflecting specific details of the custody dispute or other matters that had no bearing on the sexual assault

24

allegations.  Rather, counsel testified that:  (1) Ruzic was unable to produce the specific message and therefore he considered its existence to be "uncorroborated"; (2) Ruzic had the custody-dispute exchange that A.B. did acknowledge deleting; and (3) the messages on A.B.'s phone that the State had produced included messages that were "helpful" to the defense.  This testimony does not support the inferences that Ruzic requires this court to draw, including the critical inference that A.B. deleted other messages that were "helpful" to the defense.  That is, it cannot be inferred that an attorney in the position of Ruzic's trial counsel would have reason to believe that A.B. deleted exculpatory messages other than those accessible from Ruzic's phone, given the three facts just mentioned.

¶51    The circuit court did not expressly address the motion to compel argument.  However, the court did find that Ruzic presented no credible evidence that the specific alleged "why did you say yes" text message, along with any other sexual-assault-related messages deleted by A.B., would not have been accessible from Ruzic's phone, assuming that such messages ever existed.  From this finding, it can be reasonably inferred that the court would not have granted a motion to compel if trial counsel had made it.  Moreover, because we have concluded that Ruzic failed to meet the due process test entitling him to the deleted messages, on this basis Ruzic has also failed to show that a motion to compel would have been successful.  Accordingly, we conclude that Ruzic has failed to show that counsel performed deficiently by failing to file a motion to compel.  *See State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16 ("Counsel does not perform deficiently by failing to bring a meritless motion.").

¶52    The second error asserted by Ruzic is that trial counsel provided constitutionally ineffective assistance by failing to move to exclude the text messages that were disclosed by the prosecution and that A.B. did not delete.

25

Ruzic argues that counsel should have moved to exclude those text messages "based on the due process violation" and under WIS. STAT. § 904.03 (providing that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice") and WIS. STAT. § 901.07 (the "rule of completeness"). As to the first basis, we conclude that Ruzic has failed to show that counsel performed deficiently because, as we have concluded, there was no due process violation. As to the statutory bases, the circuit implicitly addressed and rejected those bases for granting a motion to exclude when the court referenced as reasonable counsel's asserted strategy for not having moved before trial to suppress the text messages disclosed by the prosecution.

¶53 Specifically, the circuit court noted that counsel's not moving to suppress was consistent with counsel's strategy as testified to at the second hearing—to get the text messages before the jury because many of them were helpful to the defense. The court found that the prosecution "turned over all kinds of exculpatory messages" to the defense and that "many of those exculpatory messages were presented along with the inculpatory ones to the Jury." A review of those text messages, reproduced earlier in this opinion, establishes that some of them could be interpreted to suggest that A.B. consented. Thus, Ruzic has failed to show that the text messages as a whole were so unfairly prejudicial as to outweigh their probative value, or that the court would have granted a motion to exclude only the inculpatory portions of those text messages.

¶54 As for Ruzic's rule of completeness argument, Ruzic cites no testimony from the second hearing and presents no other evidence to support the inference that the text messages on A.B.'s phone that were disclosed by the prosecution incompletely related the exchanges between Ruzic and A.B. This lack of evidentiary support was the primary reason that the circuit court rejected

Ruzic's rule of completeness argument. Specifically, the court noted that: Ruzic had not told the officer about any exculpatory messages; the State did not know of additional exculpatory text messages until Ruzic referenced the alleged "why did you say yes" exchange in his motions for postconviction relief; and, while Ruzic had told his trial counsel before trial about that alleged exchange, Ruzic could not produce it and his explanation for why he did not was found not credible by the circuit court, in a ruling that Ruzic has not shown to be clearly erroneous.

¶55 In addition, counsel testified that, had counsel moved to exclude on the ground that A.B.'s deletion of other text messages "made it impossible to satisfy the rule of completeness" to show important context, counsel would have risked the court ruling to exclude the text messages that were "helpful" to Ruzic. Counsel testified that he "was pleased" that the defense "had gotten in the messages that would be helpful" and that it would have hurt the defense if he had not. Ruzic has failed to show that counsel followed an objectively unreasonable strategy when he made this choice. In sum, we conclude that Ruzic has failed to show that counsel performed deficiently by failing to file a motion to exclude.

¶56 The third error asserted by Ruzic is that his trial counsel provided constitutionally ineffective assistance by failing to impeach A.B. at trial by examining her "about her efforts to 'clean up' or delete text messages" before she provided them to the prosecutor.[5] Counsel testified at the first evidentiary hearing on his initial motion for postconviction relief ("the first hearing") that he did not

---

[5] Ruzic also asserts that his trial counsel was constitutionally ineffective by failing to examine the officer at trial regarding the deleted text messages. However, Ruzic does not develop an argument specific to the officer and, therefore, we do not address this assertion further.

27

do so for at least the following reasons. Counsel did not know that any deleted messages were helpful to Ruzic. Moreover, Ruzic did not provide counsel with a copy of the alleged "why did you say yes" exchange for counsel to present as an example of a text message concerning the alleged sexual assaults that A.B. allegedly deleted. Also, there was nothing to be gained from asking A.B. about deleting messages because she would testify that she deleted messages that had nothing do with this case. We understand that counsel was also suggesting that eliciting such testimony would only have served to bolster A.B.'s credibility.

¶57     In sum, we conclude that Ruzic has failed to show that counsel performed deficiently in failing to impeach A.B. about the deleted messages.

¶58     The fourth error asserted by Ruzic is that his trial counsel provided constitutionally ineffective assistance by failing to examine Ruzic at trial regarding the alleged "why did you say yes" text message exchange. Counsel testified that Ruzic had told him about that alleged exchange before trial, but counsel did not know until the postconviction proceedings when Ruzic claimed that the alleged exchange occurred or what steps, if any, Ruzic took to try to preserve the exchange. Counsel further testified that he did not question Ruzic at trial about the alleged exchange because Ruzic was unable to produce it and it was otherwise uncorroborated, and therefore asking Ruzic about it before the jury would reflect negatively on Ruzic's credibility. The circuit court expressed the view that counsel "should have" asked Ruzic about the message even though it was not corroborated. However, the court also expressed the view that this one "mistake" did not prevent Ruzic from presenting his defense and did not prejudice Ruzic. The court acknowledged the key nature of the "credibility issue" between Ruzic and A.B., and pointed to what it considered the "most damaging" evidence comprising the text messages in Ruzic's own words and A.B.'s testimony,

corroborated by her sister-in-law and brother-in-law, that she contemporaneously reported the nonconsensual conduct.

¶59    We assume, without deciding, that counsel performed deficiently in not examining Ruzic about the alleged "why did you say yes" text message exchange. However, we agree with the circuit court that, if counsel had examined Ruzic about this message, there is not a reasonable probability that the jury would have acquitted Ruzic of the third-degree sexual assault charge. As noted above, portions of the text messages presented at trial also suggested that A.B. had consented. More specifically, throughout the text messages, Ruzic himself distinguished A.B.'s allegedly generally saying "yes" to sexual activity from the "disrespect" he showed by specifically ejaculating on her face. This distinction is consistent with testimony at trial that A.B. had on prior occasions consented to Ruzic ejaculating on other parts of her body but always said "no" to his ejaculating on her face. While Ruzic testified that he asked her at the time about ejaculating on her face and she said yes, A.B. testified that she did not consent to his ejaculating on her face.

¶60    Supporting A.B.'s testimony, Ruzic's sister-in-law testified that A.B. had told her about the entire incident the Tuesday after it happened, including, specifically, that Ruzic had ejaculated on her face without her consent; and Ruzic's brother testified that his wife told him the day after A.B. told her. Given this evidence, it is not reasonably probable that the outcome would have been different had the jury also heard about the additional, uncorroborated message that A.B. allegedly said "yes" to sexual activity in general in order to make up with Ruzic. Accordingly, we conclude that Ruzic has failed to show that any error by counsel for not asking Ruzic about the alleged "why did you say yes" text message exchange did not prejudice Ruzic.

*B. Error 5: Failing to Examine Ruzic About His Motivation for His Conduct and His Text Messages*

¶61    Ruzic argues that his trial counsel provided constitutionally ineffective assistance by failing to examine Ruzic at trial about his motivation for his conduct and his inculpatory text messages.

¶62    At trial, both A.B. and Ruzic testified that Ruzic had, prior to this occasion and after asking for and obtaining A.B.'s consent, ejaculated on different parts of A.B.'s body.  During the alleged sexual assaults at issue, A.B. testified that Ruzic said "you won't like it," she was scared, and Ruzic ejaculated on her face without her consent.  Ruzic testified that he said "you won't like it" and asked if he could ejaculate on her face, and she said yes.  At the first hearing, Ruzic testified that he explained to counsel that he was no longer mad at A.B. when he and A.B. engaged in sexual activity and he did not ejaculate on A.B.'s face to humiliate or degrade her.  Rather, they both had their sexual fantasies, this was one of his fantasies, and he always asked her first.

¶63    Also at the first hearing, Ruzic testified in part as follows.  He sent the text messages saying that he was disrespectful and what he did was horrendous because he was trying to make up with A.B., and she took it the wrong way.  He did not think that he did anything wrong because he asked her and she said yes, and he was trying to get her back.

¶64    Trial counsel testified that counsel did not examine Ruzic before the jury at trial about his motivation for his conduct for the following reasons:  Ruzic answered differently whenever counsel asked him; it was "dangerous" to ask, because Ruzic admitted he was very angry at A.B. before the alleged sexual assaults and given "things he had told [counsel]"; it was hard to argue that Ruzic

did not act to humiliate A.B. when he indicated in his text message that he had told her "you're not going to like this;" and counsel wanted to focus on A.B.'s consent not Ruzic's motive.

¶65 Counsel further testified that counsel did not ask Ruzic to explain his text messages in testimony to the jury because it was dangerous to "open that door," given Ruzic's answers when counsel asked him before trial what he meant by "unjust" and "horrendous." Specifically, counsel testified that it was clear that Ruzic was saying in the text messages that what he had done "wasn't appropriate" and that it would not be helpful for Ruzic to testify at trial that he said that to make up with A.B. and that he did not feel that he had done anything wrong. Counsel testified that the key was for the jury to focus on consent, and Ruzic's explanation would compromise the defense that A.B. did consent.

¶66 The circuit court found that, although Ruzic was not questioned on the witness stand about his motivation, that motivation was well explained to the jury as a sexual fantasy like the other sexual fantasies that Ruzic and A.B. had shared and engaged in. Thus, the court implicitly determined that Ruzic failed to show that counsel performed deficiently in that respect. The court did not expressly address deficient performance with respect to Ruzic's explanation that he described his conduct as disrespectful, horrendous, and unjust in his text messages to A.B. because he was trying to make up with her. Rather, the court appeared to determine that Ruzic's not providing that explanation at trial did not prejudice his defense.

¶67 We conclude that Ruzic has failed to show that counsel performed deficiently by not examining Ruzic at trial about his motivation for his conduct and his inculpatory text messages. As to asking Ruzic to explain his motivation,

we agree with the circuit court that Ruzic's version, that he was pursuing a sexual fantasy, was presented to the jury through his testimony. We also conclude that counsel followed a reasonable trial strategy not to focus on Ruzic's motivation, given his use in his text messages of demeaning language to describe the ejaculation, and instead to focus on the issue of consent. As to asking Ruzic to explain why he used the demeaning language in his text messages, we conclude that counsel also followed a reasonable trial strategy. That is, it was reasonable for counsel to forego emphasizing the demeaning language so as not to risk compromising Ruzic's credibility before the jury by asking Ruzic to offer an explanation that he was trying to make up with A.B. for the conduct that he himself described in demeaning terms. Moreover, counsel was also reasonably dissuaded from pursuing this line of questioning based on his pretrial discussions with Ruzic, as summarized above, when Ruzic made statements that counsel deemed would risk compromising the defense.

¶68 Accordingly, we conclude that Ruzic has failed to show that counsel performed deficiently by not examining Ruzic at trial about his motivation for his conduct and his inculpatory text messages.

## C. Error 6: Failing to Cross-Examine at Trial Ruzic's Brother About When He Confronted Ruzic

¶69 At trial, Ruzic's brother was called by the prosecution and testified that he confronted Ruzic about A.B.'s allegations of nonconsensual sexual conduct a few days after learning about the allegations from his wife (Ruzic's sister-in-law). Ruzic argues that his trial counsel provided constitutionally ineffective assistance by failing to cross-examine Ruzic's brother about when he confronted Ruzic. Ruzic argues that establishing that Ruzic's brother confronted Ruzic in January 2016, one year after the alleged sexual assaults occurred, would show that

A.B. did not tell Ruzic's sister-in-law until one year after the alleged sexual assaults occurred, "assuming [Ruzic's sister-in-law] told [Ruzic's brother] as soon as she learned about it." Ruzic further argues that that evidence would support the inference that A.B. delayed recounting her allegations to Ruzic's sister-in-law until January 2016, which would in turn support the defense that A.B. fabricated the allegations to police within the context of the custody disputes that were ongoing in January 2017.

¶70 A.B. testified at trial that the alleged sexual assaults occurred in December, on the weekend that her daughter had her last practice for the Christmas program at church, before the program took place on December 21, 2014. A.B. testified that she told Ruzic's sister-in-law about the alleged sexual assaults on their girls' night on the Tuesday after the assaults occurred. A.B. testified that she told Ruzic's sister-in-law that Ruzic "came on my face and then that I had tried speaking to [him] about it a few days after and he said, I don't know who that person was. I wouldn't do that. I don't know who that person was."

¶71 Ruzic's sister-in-law testified at trial that A.B. told her about the alleged sexual assaults on the Tuesday after they occurred. The sister-in-law testified that A.B. came to her house for their Tuesday girls' night and saw that A.B. was visibly upset. She asked A.B. what was wrong, and A.B. told her that Ruzic had gotten mad at her that weekend when he returned home to find the pipes frozen and "forced himself on her, and ejaculated on her face." The sister-in-law testified that she told A.B. to report the alleged sexual assaults to police, but A.B. was scared and did not want to because they were still married. The sister-in-law testified that A.B. told her about the alleged sexual assaults in December, before their children's Christmas program, and that it was awkward at the program

33

because all of their children were in the program together. The sister-in-law testified that this was the only time that she talked to A.B. about the alleged sexual assaults before A.B. reported them to police.

¶72    Ruzic's brother testified at trial that he was out bowling on Tuesday and the next morning, Wednesday, his wife told him what A.B. told her about the alleged sexual assaults. He testified that he "asked [Ruzic] if he raped [A.B.]" a few days later. He also testified that his wife told him before New Year's. Counsel did not cross-examine Ruzic's brother about what year he confronted Ruzic.

¶73    Ruzic testified at trial that the confrontation occurred as his brother described it, in that his brother "reamed me out" for sexually assaulting A.B. and Ruzic remained silent. Ruzic further testified that, after his brother left, Ruzic called A.B. and asked her what she told his brother.

¶74    At the first and second hearings, Ruzic testified that he told trial counsel before trial that his brother confronted him on January 18, 2016; that afterward, on the same day, Ruzic tried calling A.B. and asking what she told his sister-in-law and brother; and that later that evening A.B. sent her text messages accusing him of rape. As stated, the first text messages presented at trial by the prosecution about the alleged sexual assaults were dated January 18, 2016. Ruzic testified at the second hearing that he told counsel multiple times when his confrontation with his brother occurred and he believed that the timing would be presented at trial, but counsel refused to do so.

¶75    At the second hearing, counsel testified that he did not recall why he asked Ruzic's brother how he found out about A.B.'s allegations but did not ask the brother what year the brother confronted Ruzic. Counsel testified that there

was a risk in not knowing how the brother would answer. Counsel further testified that the brother came off as "doing whatever his wife told him," and counsel did not want to cross-examine the brother further. Counsel also testified that Ruzic had not told counsel in their private discussions when the brother confronted Ruzic, and that counsel did "not believe" that Ruzic told counsel that the January 18, 2016 text messages were dated the same day that the brother confronted Ruzic, or about the confrontation with the brother "being part of the reason that [Ruzic] contacted [A.B.]."

¶76    The circuit court did not expressly address the conflicting testimony by Ruzic and counsel regarding what Ruzic told counsel in their private discussions about the timing of the confrontation. The court also did not address deficient performance. However, the court implicitly determined that counsel's failure to cross-examine Ruzic's brother regarding when the confrontation occurred did not prejudice Ruzic, given the "overwhelming" evidence presented at trial that the sister-in-law heard about the alleged sexual assaults from A.B. in December 2014. That is, any testimony that the confrontation occurred in January 2016 would not show that A.B. did not tell Ruzic's sister-in-law about the alleged sexual assaults until then, because the only evidence presented at trial was that A.B. told Ruzic's sister-in-law about the alleged sexual assaults a few days after they occurred. The circuit court pointed to the sister-in-law's unrebutted trial testimony showing that A.B.'s recounting of the alleged sexual assaults to the sister-in-law was contemporaneous, including the following:

- When A.B. came over for the Tuesday girls' night, A.B. was visibly upset and said that she and Ruzic had got into an argument over the weekend and he was mad and he forced himself on her and

ejaculated on her face; thus A.B. told the sister-in-law the Tuesday after the incident.

- A.B. told the sister-in-law that A.B. did not want to report the alleged sexual assaults to police because she was scared and they were still married, but, if she told the sister-in-law in January 2016, that would not make sense because A.B. had already filed for divorce in August 2015; thus A.B. told the sister-in-law before the separation and divorce filing in 2015.

- It was awkward because their children were all in the same Christmas program together, but in 2016 A.B. was living in Kaukauna; thus their children were not together in January 2016.

- The only time that the sister-in-law talked to A.B. about the alleged sexual assaults was at the time that they happened, and she and A.B. did not again talk about them until A.B. reported them to the police and the sister-in-law talked to the investigating officer.

The court concluded that there was no credible evidence to support an inference that A.B. told Ruzic's sister-in-law about the alleged sexual assaults in January 2016.

¶77    We conclude that Ruzic has failed to show that counsel performed deficiently by failing to cross-examine Ruzic's brother about what year he confronted Ruzic. To repeat, Ruzic's brother testified that he confronted Ruzic a few days after he heard about the alleged sexual assaults from Ruzic's sister-in-law, which was before New Year's. The only evidence as to when that precipitating conversation occurred was the sister-in-law's testimony that A.B.

36

told her about the alleged sexual assaults on the Tuesday after the alleged sexual assaults occurred, and Ruzic's brother testified that his wife told him the next day. Counsel testified that it would have been risky to further question Ruzic's brother about when the confrontation occurred because counsel did not know how Ruzic's brother would answer and Ruzic's brother appeared to do "whatever his wife told him." It was objectively reasonable for counsel not to question Ruzic's brother as to when more specifically he confronted Ruzic given these unknowns.

### D. Error 7: Failing to Challenge Through Examination at Trial A.B. and Ruzic's Mutual Friend Who Testified Differently from His Statement to the Officer

¶78 Ruzic argues that his trial counsel provided constitutionally ineffective assistance by failing, through trial examination, to challenge A.B. and Ruzic's mutual friend, who testified differently from his statement to the investigating officer.

¶79 The investigating officer reported that A.B. told him that she had told A.B. and Ruzic's mutual friend about the alleged sexual assaults. The officer reported that the friend told the officer that he recalled "a conversation [with A.B.] about [Ruzic] being mad and striking the wall." When the officer asked him if he had spoken with A.B. "about a possible sexual assault, he told me that he did not hear anything about that, stating that he would remember something like that."

¶80 At trial, A.B. testified that she told the friend about the alleged sexual assaults "the next day" and told him that Ruzic "forced himself on me and he came on my face." Counsel called the friend as a witness for the defense. The friend testified that A.B. called him and told him about the frozen pipes and that Ruzic had been mad at A.B. and punched a hole in the wall, and A.B. said that she wanted the friend to help improve things perhaps by talking to Ruzic. The friend

also testified that A.B. told him that they had sexual intercourse and Ruzic ejaculated over her face, which upset her.

¶81 At the first hearing, counsel testified that the friend's statement to the officer, that he recalled A.B. saying nothing about a sexual assault, indicated that A.B. was not truthful in what she told the officer that she had told the friend. Counsel testified that he expected that the friend would testify consistently with that statement, and, when counsel talked to the friend on the phone, the friend did not indicate anything different. Counsel testified that, because the friend deviated from what counsel expected him to say at trial, it would be "perilous to ask him more questions." Counsel further testified that to challenge the defense's own witness was "fraught with possible negative consequences." Moreover, counsel testified that it was not crucial to challenge the friend because the friend did not testify that A.B. told him that the sexual intercourse and ejaculation were nonconsensual, and Ruzic admitted that the sexual conduct occurred (although consensually).

¶82 The circuit court determined that Ruzic failed to show that counsel performed deficiently, relying in part on the fact that the friend's testimony that A.B. told him about Ruzic's sexual conduct was consistent with the friend's statement, as reported by the officer, that he did not recall her saying anything about a sexual assault. We likewise conclude that Ruzic has failed to show that counsel performed deficiently, both for the reason stated by the circuit court, and also because it was reasonable for counsel to not risk challenging his own witness about testimony that, as far as it went, did not undermine Ruzic's defense based on consent, when counsel did not know how the witness would answer.

¶83     Ruzic notes that counsel "agreed" at the first hearing that the audio recording of the officer's interview with the friend indicates that the friend said that he did not recall A.B. mentioning "anything sexual."  Ruzic appears to be arguing that, if the friend had, under further questioning, agreed that he accurately told the officer he did not recall A.B. mentioning anything sexual in December 2014, contrary to the testimony he had just offered, that would support the defense that A.B. fabricated the allegations of sexual conduct altogether in January 2017.  However, Ruzic presents no basis to conclude that it was deficient for counsel not to further question the friend on this point, particularly in light of the testimony that counsel was especially uncertain and fearful about how the friend might answer.  Moreover, and notably, Ruzic agreed that "something sexual" had occurred, his defense was that it was consensual, and the friend's testimony as it stood did not negate that defense.

¶84     Accordingly, we conclude that Ruzic has failed to show that counsel performed deficiently by failing to challenge through trial examination the friend who testified differently from his statement to the investigating officer.

### E.  Error 8:  Failing to Impeach A.B. at Trial About Her Testimony Regarding the Date of the Frozen Pipes Incident

¶85     Ruzic argues that his trial counsel provided constitutionally ineffective assistance by failing to impeach A.B. at trial about her testimony regarding the date of the incident involving the frozen pipes that was different from the date she testified to at a prior hearing in a separate case involving her petition for a harassment injunction.

¶86     At trial, A.B. testified that the incident involving the frozen pipes and the sexual assaults occurred on the weekend of December 12-13, 2014, before

the children's Christmas program which took place on December 21, 2014. A.B. also testified that she filed a petition for harassment injunction "around the same time" that she reported the alleged sexual assaults to police in January 2017, and she presented exhibits showing that the injunction was granted by the circuit court in March 2017.

¶87     Counsel presented testimony by A.B. and Ruzic's mutual friend, Ruzic's mother, A.B.'s father, and Ruzic, which was directed at showing that the incident involving the frozen pipes occurred after Ruzic's birthday in late January 2015. On cross-examination at trial, Ruzic acknowledged that his work records showed that he could have been home on the weekend beginning December 13, 2014.

¶88     In support of his motion for postconviction relief, Ruzic presented evidence showing that, at the March 2017 harassment injunction hearing, A.B. testified that the incident involving the frozen pipes occurred on December 20, 2014, and she was "almost positive" about that date. At the injunction hearing, Ruzic presented his workplace timesheet for that date showing that he worked from 6:00 a.m. to 12:00 p.m. and from 12:30 to 5:30 p.m. on December 20, 2014, in West Bend, which is about a three-hour drive from their home. A.B. reaffirmed that she was "almost positive" that the frozen pipes incident occurred on December 20, 2014.

¶89     Ruzic argues that the workplace timesheet presented at the injunction hearing showed that it was "impossible" for the frozen pipes incident as described by A.B. to have happened on December 20, 2014. He further argues that, at trial, when A.B. testified that the incident occurred on December 12-13, counsel was deficient for not impeaching her with how she had previously testified

that the date was December 20 and was now changing her testimony after learning that that date was impossible.

¶90 At the first hearing, counsel testified that he did not pursue A.B.'s testimony at the harassment injunction hearing because he had achieved his goal of impeaching A.B.'s credibility as to when the frozen pipes incident occurred. The circuit court agreed, finding that A.B. "was impeached a lot" regarding the date of the incident, and that to pursue her testimony at the injunction hearing would be to "beat a dead horse." Accordingly, the court determined that Ruzic failed to show that counsel performed deficiently in this respect.

¶91 We agree with the circuit court. Moreover, for counsel to focus the jury's attention on the harassment injunction hearing in connection with her testimony about the alleged sexual assaults would have risked planting in jurors' minds the idea that the harassment injunction involved the sexual conduct at issue in this case. As we explain next, no such connection had been intimated in the limited testimony that was presented at trial about the harassment injunction.

¶92 Accordingly, we conclude that Ruzic has failed to show that counsel performed deficiently by failing to impeach A.B. at trial about her testimony regarding the date of the incident involving the frozen pipes that was different from the date she testified to at a prior hearing in a separate case involving her petition for a harassment injunction.

### F. Error 9: Failing to Object to Trial Testimony Regarding the Harassment Injunction

¶93 Ruzic argues that his trial counsel provided constitutionally ineffective assistance by failing to object to trial testimony that the harassment injunction was granted to A.B. Specifically, Ruzic argues that the testimony that

the injunction was granted improperly bolstered A.B.'s credibility by indicating to the jury that another court found that A.B. was telling the truth and that Ruzic was guilty.

¶94    The only references at trial to the harassment injunction were as follows.  A.B. testified that she petitioned for the harassment injunction at about the same time that she reported the alleged sexual assaults to the police, and that the injunction was granted.  A.B. presented two exhibits showing that the court commissioner issued the order for the harassment injunction on January 17, 2017, and that, after Ruzic appealed, the circuit court issued the order for the harassment injunction in March 2017, but for a shorter time than ordered by the court commissioner.  The order was entered on a pre-printed form on which certain boxes were checked stating that there are reasonable grounds to believe that Ruzic harassed A.B. and ordering Ruzic not to harass A.B., to avoid her residence, and to avoid contacting her.  The order contains the added handwritten provision that the injunction does not prevent Ruzic "from exercising his placement rights pursuant to family court order."

¶95    Ruzic confirmed in his testimony at trial that A.B. filed the petition for the harassment injunction on January 13, 2017, after she reported the alleged sexual assaults to police on January 6, 2017, and that the two exhibits referenced above were the harassment injunction orders subsequently signed by the court commissioner and circuit court.  On cross-examination, Ruzic confirmed that the two exhibits were part of the same case, and that the court granted the injunction.

¶96    In the prosecution's closing argument, the prosecutor described how, even after A.B. filed for divorce and the divorce was finalized, Ruzic kept texting her about the frozen pipes incident and "to rehash their marriage to say he would

be a better person." But, the prosecutor continued, A.B. was "done" and wanted Ruzic to stop harassing her so she could move on. The prosecutor then remarked, "Finally, in January of 2017, she's had enough. She reports the sexual assault. She files for harassment injunction. That injunction was proved. Unfortunately, the criminal process takes a little bit longer. You can see yesterday when [A.B.] testified, it wasn't easy for her to talk about these events."

¶97 In the defense's closing argument, counsel recounted A.B.'s efforts to control the outcome of their custody disputes and said:

> But on January 13th, only one week exactly after she first reported [the alleged sexual assaults to police], that's when she filed for that injunction. Do you really think that was just -- she said it was coincidental. That was her, I asked her that. You heard it. Do you really think that was coincidental, that she makes a report like that, claiming that my client sexually assaulted her and that it had nothing to do with the -- her version then had nothing to do with trying to gain advantage in a custody battle? I think that that, that's a huge hole in this piece of cheese.
>
> ….
>
> I don't think so. I think the evidence is going to show she asked him [to terminate his parental rights] because she had plans to move out of state and she didn't want him involved. That didn't work, so she filed a harassment injunction against him. Well, that's fine. But that also shows how mad she was.

¶98 At the first hearing, counsel testified that he did not object to A.B.'s testimony at trial that the harassment injunction was granted because nothing in that testimony, or in the prosecution's closing argument, suggested that the injunction was granted because of the alleged sexual assaults rather than because of Ruzic's text messages after the divorce. Counsel further testified that it was clear from the evidence that both A.B. and Ruzic were harassing each other, and

that, in the context of that evidence, there was no implication to the jury that the injunction was granted because of the alleged sexual assaults.

¶99     The circuit court determined based on several grounds that Ruzic failed to show that counsel performed deficiently by not objecting to the testimony that the harassment injunction was granted. The court explained that it allowed that testimony as a consequence of defense counsel's pretrial motion to admit evidence of A.B.'s text message asking Ruzic to terminate his parental rights, and, therefore, the court would have overruled any objection. The court elaborated that A.B.'s conduct post-divorce was an important part of the defense, and that the evidence that A.B. reported the alleged sexual assaults in the midst of the harassment and contempt hearings "fed right into the defense" that A.B. fabricated the claim of non-consent. The court agreed with counsel that the filing of the injunction petition also "fed right into their defense" and that there was no evidence suggesting that the granting of the injunction had any logical connection with the alleged sexual assaults.

¶100   We again agree with the circuit court. As explained by the circuit court, the testimony that the injunction was granted, taken in the context in which it was presented at trial and in which it was argued by the prosecutor and counsel in their closing remarks, presented to the jury no connection between the granting of the injunction and the alleged sexual assaults. To the contrary, it supported the defense that A.B. sought the injunction and fabricated her allegations to gain an advantage in the ongoing custody disputes between them. It was reasonable for counsel to allow that testimony and to use it to support that defense.

¶101 Accordingly, we conclude that Ruzic has failed to show that counsel performed deficiently by failing to object to trial testimony that the harassment injunction was granted to A.B.

¶102 In sum, we conclude that, with one exception, Ruzic has failed to show that counsel performed deficiently. We also conclude that Ruzic has failed to show that the one exception, counsel's failure to ask Ruzic about the uncorroborated alleged "why did you say yes" text message, prejudiced Ruzic's defense. Therefore, we conclude that Ruzic has failed to show that his claims of ineffective assistance of counsel entitle him to a new trial.

## CONCLUSION

¶103 For the reasons stated, we affirm the judgment of conviction and the order denying postconviction relief.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.